IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Newport News Division



FILED

SEP 2 9 2011

CLERK, US DISTRICT COURT
NORFOLK, VA

CHARLES W. ROSS BUILDER, INC.
d/b/a CHARLES ROSS HOMES,
     Plaintiff,

     v.                                 Civil Action No. 4:10cv129

OLSEN FINE HOME BUILDING, LLC,
BEVERLY OLSEN,

BOATHOUSE CREEK GRAPHICS, INC.,
RICK J. RUBIN, and
JENNIFER L. RUBIN,
     Defendants.

## OPINION AND ORDER

This matter comes before the Court upon Defendants' Olsen Fine Home Building, LLC, Beverly Olsen, Boathouse Creek Graphics, Inc., Rick J. Rubin, and Jennifer L. Rubins (collectively "Defendants") Motions for Summary Judgment. This Court has subject matter jurisdiction over Plaintiff Charles W. Ross Builder, Inc.'s ("Plaintiff") Amended Complaint, which alleges violations of the Federal Copyright Act, 28 U.S.C. § 101, et seq., the Digital Millennium Copyright Act, 17 U.S.C. § 1202(b), and the Lanham Act, 15 U.S.C. § 1051 et seq.

Plaintiff is a custom home designer and builder operating primarily in the Williamsburg area of Virginia. Plaintiff is a corporation existing under the laws of the Commonwealth of Virginia and has its principal place of business in Williamsburg, Virginia. (Pl.s Am. Compl. ¶ 2.) Defendant Olsen Fine Home Building, LLC, is a builder in Williamsburg and subdivision of Ford's Colony in Virginia and the builder of the dwelling utilization plans drawn up by

1

Boathouse Creek Graphics. Owner and co-defendant Beverly Olsen reportedly has constructed at least eight houses in the Ford's Colony neighborhood of Williamsburg in the past ten years. Defendant Boathouse Creek Graphics is a residential design corporation organized and existing under the laws of the Commonwealth of Virginia with its principal place of business in Yorktown, Virginia. Finally, Defendants Rick and Jennifer Rubin ("the Rubins") are individuals residing in Williamsburg, Virginia.

This is a copyright infringement suit concerning a single-family home designed and constructed for the Rubins in the subdivision of Ford's Colony in the Williamsburg area of James City County, Virginia. Plaintiff's Amended Complaint alleges that the Rubins toured a copyrighted model of Plaintiff's "Bainbridge" model home, received a promotional brochure which contained floor plans for many different homes, including the Bainbridge, and subsequently contracted with Defendants Boathouse Creek Graphics, Inc., Olsen Fine Home Building, LLC, and Beverly Olsen, to design and build a home substantially similar to Plaintiff's copyrighted model. Plaintiff's four-count Amended Complaint alleges federal copyright violations against all Defendants (Count One), alleges that the Rubins contributed to or induced said copyright infringement (Count Two), and alleges violations of the Digital Millennium Copyright Act (Count Three) and unfair competition (Count Four) against Boathouse Creek Graphics and Olsen Fine Home Building.

For the reasons stated herein, this Court finds that Defendants' Motions for Summary Judgment are **GRANTED.**

## I.    FACTUAL AND PROCEDURAL HISTORY

This case presents a novel situation in the area of Architectural Copyright Law because of the myriad influences dictating nearly every design element of the two houses at issue in this litigation.  These governing forces all originate from the simple fact that both of the homes at issue are designed in traditional Georgian style and are located in the Ford's Colony subdivision of historic Williamsburg, Virginia.

### A.    Ford's Colony

Ford's Colony is one of the largest, if not the largest, gated communities in Virginia.  It comprises 3,000 lots, 2,238 individual residences, three golf courses, swimming pools, tennis courts, several recreational facilities, and a Marriott Resort Area.

The subdivision sits in the heart of Williamsburg in James City County, Virginia—also home to the historic College of William and Mary.  The second oldest college in the country, the school was chartered in 1693 by King William III and Queen Mary II of England, and broke ground on the Sir Christopher Wren Building in 1695.  The Wren Building, designed by famed British architect Sir Christopher Wren, served as the main building of the college in this early period.  The building exemplifies the balance and proportion uniquely characteristic of early colonial architecture and is generally accorded to mark the beginnings of colonial architecture, which was the forerunner of Georgian-style architecture in Virginia.

Following the construction of the Wren Building, the Georgian style became the Colonial vogue in Williamsburg, as demonstrated by the numerous other residences in the area famous for their adherence to the boxy, symmetrical Georgian style.  Indeed, James City County houses both "Westover Plantation" and "Carter's Grove," each of which are widely recognized as early examples of Georgian style and which are often referred to as Classical Georgian.  Westover

3

Plantation was constructed in 1750 by William Byrd III. Carter's Grove was built around the same time by King Carter for his grandson, Carter Burwell, and was designed by, among others, the Taliaferros, a prominent Virginia family still living in the area.

In light of its close proximity to historic Colonial Williamsburg, development in Ford's Colony is highly restrictive and follows to a large extent the Georgian colonial way. Home design and construction are strictly limited to traditional colonial architecture styles "indigenous to the colonial Virginia area." Ford's Colony Envtl. Control Comm., Purchaser's Handbook for Single Family Homebuilding at Ford's Colony 3 (2008) [hereinafter "Purchaser's Handbook"]. This is in accord with the stringent residential restrictions which apply to all Ford's Colony properties. In fact, only five architectural styles are permitted in the expansive subdivision: Colonial, Georgian, Classical Revival, Federal/ Adam, and Greek Revival. Id. at 11; see also Ford's Colony Williamsburg, http://www.fordscolony.com (last visited September 29, 2011) (follow "For Buyers" drop down menu, click on "Custom Home Styles").

Prior approval by the Environmental Control Committee ("ECC"), a development oversight body, is required to approve the design of any and all homes. To this end, a 102-paged "Purchaser's Handbook" detailing numerous stylistic requirements and limitations on construction is distributed to all persons desiring to build a home in Ford's Colony. The "Purchaser's Handbook" and ECC together "provide reasonable and objective control over site planning, architecture, and landscaping design" in the neighborhood. Purchaser's Handbook, supra, at 11.

The ECC requires that custom homes be "as authentic as practical," and cautions that "[m]ixtures of architectural styles in one building will not normally be approved." Id. ("For

4

example, a traditional home of the Georgian period should respect the details and disciplines of that period and not include designs of other eras.") Ford's Colony's Web site offers guidance on characteristic features of each architecture style and specifically notes that "Georgian Colonial Homes typically have these features: Square, symmetrical shape; paneled front door at center; decorative crown over front door; flattened columns on each side of door; five windows across front; paired chimneys; medium pitched roof; minimal roof overhang." Ford's Colony Williamsburg, http://www.fordscolony.com (last visited September 29, 2011) (follow "For Buyers" drop down menu, click on "Custom Home Styles," click on "Georgian" hyperlink).

More than thirty pages of Ford's Colony's "Purchaser's Handbook" are devoted to pictorial examples of permissible and impermissible design details. For example, lone transom windows, such as might be used to light a shower or closet, are expressly disallowed. Purchaser's Handbook, supra, at Ex. VI-31. Likewise, dormers may not feature siding detail, id. at Ex. VI-33, and dormers accented with circle head windows must be designed such that the circle head projects into the pediment. Id., at Ex. VI-34. The Handbook specifies that spacing between the top of garage doors and the frieze board may not exceed four feet, id. at Ex. VI-32, and provides numerous drawn depictions of permissible cornice detail, deck column detail, chimney elevation and detail, entry pediment elevation, dormer detail, and the like. Id. at Ex. IV-1 to VI-36. The Handbook suggests preferred paint colors, and directs purchasers specifically to the "Historic Williamsburg" paint line by Pratt and Lambert or the "Historic Colors" line by Benjamin Moore and Company. Id. at 11.

It is under the ECC's close scrutiny that designers such as Plaintiff and Defendants Olsen Fine Home Building and Boathouse Creek Graphics draw custom home plans in conformity with the detailed requirements of the Purchaser's Handbook and Ford's Colony's rigidly restrictive

covenants. It is not surprising, then, that many homes in the colonial neighborhood, particularly homes built in the same architectural style, resemble each other to a substantial degree. (See Def.'s Mot. Summ. J., Ex. 7, ECF No. 44 (twenty-one photographs of Georgian style homes in Ford's Colony all displaying common elements of Georgian architecture)). Indeed, the "Purchaser's Handbook" even anticipates "essentially complete duplications of exterior architectural design," although it requires that such anticipated duplications not be visually in range of each other. Purchaser's Handbook, supra, at 12.

### B.   *Colonial Georgian Architecture*

The Georgian style, as first interpreted by Italian architect Andrea Palladio, dominated the British and Colonial architectural vogue from the year 1714 through approximately 1837. Ingrid Cranfield, Georgian House Style: An Architectural and Interior Design Source Book 15 (1997); 5 The New Encyclopædia Britannica 204 (15th ed. 2005). Palladio emphasized proportion, requiring that "the halls should be the central axis of the building and the rooms should be arranged symmetrically." Cranfield, supra, at 16. Additional features typifying the Palladian style included houses of "red brick with white-painted wood trim. Interiors had central halls, elaborately turned stair balustrades, paneled walls painted in warm colours and white plaster ceilings." 13 The New Encyclopædia Britannica, at 960.

Around 1760 Georgian style gradually integrated the Adam or neo-Classical style, a Greek revival pioneered by brothers Robert and James Adam. Cranfield, supra, at 21–22. The Adam style incorporated curved interior walls, such as in staircase halls; arches on landings and passageways; ornamental Venetian windows; doorways with pilasters separating the door from side lights; and fanlight arches covering the entire doorway. Id. at 22–23. The Adam brothers

"paid attention not only to decoration *per se* but also to furnishings, variety in room shapes and the balance between the configuration of floors with that of walls and ceilings." Id.

Beginning in about 1790, Georgian style experienced a third amalgamation called the Regency period, which "was not . . . a definite style—rather a matter of 'trimmings', . . . ." Id. at 24. "On the whole, architecture at this time reflected a change in mood towards a more casual and playful, less orthodox and formal style." Id. Features of this period included

> battlemented and indented parapets; pointed casement windows with tracery in the heads, margin lights and drip moulds above them; pointed doorcases with shafts or reeding up the sides and meeting at the top in an arch; hooded or unhooded wrought- or cast-iron balconies on windows and porches; shallow, curved bays often running the full height of the building; and shallow-pitched roofs. Id. at 24-25.

Taken together, the three phases comprising the Georgian period form a style generally characterized by symmetry; aligned windows; gambrel, gabled, or hipped roofs; paneled doors accentuated by classical pilasters and a proportioned, pedimented entablature; rectangular or half-round transom lights, side lights, and elliptical fanlights; double-hung windows typically six over six; and front entrances framed by pilasters and an entablature but no covered porch supported by columns. John Milnes Baker, American House Styles: A Concise Guide 42–47 (1994). Thus, the fundamentals of Georgian style architecture were well-established centuries ago, and the mere selection of Georgian style pre-determines many aspects of both the interior and exterior architectural design. Williamsburg itself embodies the Colonial and Georgian architecture which was prevalent in the area in the twentieth century and which continues in this century.

7

### C.     The "Bainbridge" Model and the Rubins' Residence

Turning now to the instant case, in the spring of 2009, Defendants Rick and Jennifer Rubin toured a "Bainbridge" proprietary model home designed, constructed and copyrighted as an architectural work by Plaintiff.   The model home is located in the Ford's Colony neighborhood of Williamsburg.  The Rubins took a "For Sale" brochure with photos and sale prices as they left the tour.  The brochures that have been supplied to this Court did not include a floor plan or indicate that the model home in the brochures is a copyrighted architectural work.

The Rubins thereafter contacted Plaintiff to schedule an appointment to discuss the possibility of Plaintiff's building a custom home for them.   The meeting was originally scheduled for June 3, 2009.   However, apparently because Mr. Rubin felt that the person responsible for scheduling the meeting on Plaintiff's behalf had been somewhat abrupt and unpleasant, the Rubins canceled their meeting with Plaintiff before June 3, 2009.  Around this time, Defendants received an unsolicited, complimentary copy of Plaintiff's portfolio, "Places to Call Home."  Mr. Rubin states that he received the portfolio sometime after he canceled the June 3, 2009, meeting.  Plaintiff indicates that it mailed the portfolio to the Rubins the day after the Rubins had initially scheduled the June 3, 2009, meeting (on or about May 21, 2009).

Plaintiff's portfolio forms the basis for this suit.  It contains 38 inside pages with 18 different "style" homes.  On the 26th page of the portfolio is an artist's rendering of "The Bainbridge" as might be viewed from the street.  On the 27th page is a drawing of the floor plan outlining the rooms on the first and second floors.  There is no artist's rendering of the rear or sides of the home except that which is viewable from the front of the building or street.  Nor is there any floor plan outlining the basement or the dormer floor which is the third floor above the ground which has, according to the artist's rendition, three dormers.

Below the artist's rendition on page 26 the following is stated: "The traditional Georgian exterior of this home belies a floor plan designed for modern life styles." Below the floor plan on page 27 is as follows: "Copyright 2006 Charles Ross Homes." The second to last page of the portfolio states: "No portion of any plan may be reproduced or utilized in any form or by any means without the express permission of Charles Ross Homes. Charles Ross Homes retains the exclusive right to construct the plans within a 50-mile radius of Williamsburg, Virginia." Thus, Charles Ross Homes claims the exclusive right to build the 18 style homes featured in "Places to Call Home" not only in the City of Williamsburg, but also the Cities of Newport News, Hampton and Norfolk, and parts of Suffolk, Chesapeake and Virginia Beach. Sometime after Plaintiff mailed this brochure to Defendants, Defendants engaged Boat House Creek Graphics to design a home and Beverly Olsen and Olsen Fine Home Building to build it.

Plaintiff's "Bainbridge" home is an all brick Georgian style home with a two-story rectangular main body flanked by single story dependencies and a detached three-car garage connected by covered breezeway. The "Bainbridge" features two double hung sash windows on either side of a single, centered paneled door, five double-hung windows across the second story and three dormers across a gabled roof. The home displays a half-round window in both gable ends. The dormer motif is not carried over to the garage, though the garage mirrors the home with a half-round window in each gable end. The home includes dentil mould on all front cornicing and over the doorway, brick jack arches above each window, shutters, paired interior chimneys, and louvered rectangle vents. The "Bainbridge's" single front paneled door is highlighted by side-lights and a rectangular transom set beneath a corresponding rectangular covered entry pediment.

9

The "Bainbridge's" interior presents typical Georgian balance expressed as a centered foyer symmetrically flanked by a dining room and library.[1]  The foyer leads to an open concept floor plan which connects a two-story great room to a kitchen and keeping room on the left and a lower level master suite on the right.  The main body of the home including the veranda forms a perfect rectangle such that the dining room, kitchen, and keeping room share the same width, and likewise the veranda, great room, and foyer/ library also share a similar width.

The Rubins' home also exemplifies classic Georgian detail.  The home presents as a two-story brick veneer main body flanked by single-story veneer siding dependencies connected to a veneer siding three-car garage by a breezeway.  The five double hung sash windows across the second story balance five gabled dormers.  The use of dormers is further carried over to the garage, which features three gabled dormers and rectangular windows in both the front and back gables.  The Rubins' home includes paired end chimneys which run the full height of the house.  The Rubins' double paneled front doors are unaccompanied by a transom or sidelights.

The interior of the Rubins' home adheres to traditional Georgian emphasis on symmetry with a centered foyer that bisects a dining room and library on the first floor.  Like the Bainbridge, and presumably like many other Georgian styles homes, the main body of the home

---

[1] It is interesting to note that, with respect to the layout of the rooms, the floor plan of the first floor of the Bainbridge is in accordance with a classic Georgian style, as exemplified by the remarkably similar first floor layouts of 219 Chestnut Lane, available at Stephen Fuller Designs, http://www.stephenfuller.com/plan_details2.php?pid=5791 (last visited September 29, 2011), "The Capistrano", available at Donald J. Gardner Designs, http://www.dongardner.com/images.aspx?pid=3938&fn=floorplans%5c1227d1_f.gif&f= (last visited September 29, 2011), and the "Georgia Peach," available at http://www.eplans.com/colonial_revival_house-plans/HWEPL02550.hwx (last visited September 29, 2011).  In fact, the only apparent difference between the Bainbridge and these three sets of first floor plans is the size of the rooms and that the "Keeping Room" and "Veranda" of the Bainbridge are called a "Breakfast Nook" and "Deck", respectively, in 219 Chestnut and the Georgia Peach, and a "Hearth Room" and "Porch," respectively, in The Capistrano.

forms a perfect rectangle such that the dining room, kitchen, and keeping room share the same width, and likewise the veranda, great room, and foyer/ library also share a similar width.

## II.    **LEGAL STANDARD**

In reviewing a motion for summary judgment under Federal Rule of Civil Procedure 56, the Court construes all facts and inferences in the light most favorable to the non-moving party. Scott v. Harris, 550 U.S. 372, 378 (2007) (citing United States v. Diebold, Inc., 369 U.S. 564, 655 (1962); Saucier v. Katz, 533 U.S. 194, 201 (2001)).  The Court will grant such a motion "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56.  Summary judgment is warranted "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986).  "One of the principal purposes of the summary judgment rule is to isolate and dispose of factually unsupported claims or defenses." Id. at 323–24.

In the context of copyright infringement claims, a court may properly determine noninfringement of copyright as a matter of law either when the alleged similarities concern only noncopyrightable material or when no reasonable trier of fact could find the two works in question to be substantially similar. Walker v. Time Life Films, Inc., 784 F.2d 44, 48 (2d Cir. 1986); Smith v. Jackson, 84 F.3d 1213 (9th Cir. 1996).  In fact, the Eleventh Circuit has held that summary judgment is particularly appropriate where (i) access has been established and the crucial issue is substantial similarity, (ii) there may be substantial similarity with respect to noncopyrightable elements of the two works and (iii) as to non-protectable elements, there are

substantial differences between the two works. Intervest Constr., Inc. v. Canterbury Estate Homes, Inc., 554 F.3d 914, 920 (11th Cir. 2008). As that Court stated in Intervest, "when the crucial question in a dispute involving compilations is substantial similarity at the level of protectable expression, it is often *more* reliably and accurately resolved in a summary judgment proceeding . . . because the judge is better able to separate original expression from the non-original elements of a work." Id. (emphasis added). This court agrees.

### III.   ANALYSIS

### 1.  FEDERAL COPYRIGHT LAW CLAIMS

A plaintiff seeking to prove federal copyright infringement must first produce a valid copyright and then must establish that the defendant, without authorization, copied the protected work. Nelson-Salabes, Inc. v. Morningside, Dev., LLC, 284 F.3d 505, 513 (4th Cir. 2002) (citing Towler v. Sayles, 76 F.3d 579, 581 (4th Cir. 1996)). Because actual copying is in many cases very difficult to prove, a plaintiff may establish copying indirectly by showing that the defendant had (1) access to the copyrighted work and (2) that substantial similarity exists between the copyrighted work and the infringing work. Keeler Brass Co. v. Continental Brass Co., 862 F.2d 1063, 1065 (4th Cir. 1988).

#### *A.  Validity of Plaintiff's Copyright*

Plaintiff has tendered copies of its copyright registration certificates for the plans at issue. Such certificates create the presumption of copyright validity and ownership. Ronald Mayotte & Assoc. v. MGC Bldg. Co., 885 F. Supp. 148, 152 (E.D. Mich. 1994); Eckes v. Card Prices Update, 736 F.2d 859, 861 (2d Cir. 1984). Because Defendants do not contest the validity of Plaintiff's copyright, this Court proceeds on the presumption that Plaintiff has a valid copyright on the Bainbridge model home.

However, although this Court recognizes that both statute and case law dictate that the existence of a certificate of copyright carries with it a presumption of originality, see, e.g., Swirsky v. Carey, 376 F.3d 841, 851 (9th Cir. 2004); Modern Publ'g, a Div. of Unisystems, Inc. v. Landoll, Inc., 841 F. Supp. 129, 132 (S.D.N.Y. 2004), 17 U.S.C. § 410(c), we find it essential to note that copyrights are entirely different from patents. To register and get a certificate of copyright, one merely needs to file his or her copyright. Unlike patents, the novelty of which are determined by a patent examiner before a patent may issue, there is no test to determine originality in the context of copyrights. Thus, in light of the fact that "the Copyright Office tends toward cursory issuance of registrations," we find, in line with the Fourth Circuit's position, that the presumption of originality which rides on the coattails of a copyright certificate is easily rebutted. Universal Furniture Int'l, Inc. v. Collezione Europa USA, Inc., 618 F.3d 417, 430 (4th Cir. 2010).

### B. Defendants' Access to Plaintiff's Copyrighted Work

"A factual finding of access may be based upon a finding that the infringer had a reasonable probability of seeing the prior work, and thus had an opportunity to copy it." Axelrod & Cherveny Archetects, P.C., v. Winmar Homes, No. 2:05cv711, 2007 WL 708798 at *11 (E.D.N.Y. Mar. 6, 2007); Bonner v. Dawson, No. 5:02cv65, 2003 WL 22432941 at *5 (W.D. Va. Oct. 14, 2003) (access may be proven by demonstration that "the person who composed the allegedly infringing work had the opportunity to view or copy the copyrighted material"). This showing "must establish more than a mere possibility that such a possibility could have arisen; it must be reasonably possible that the paths of the infringer and the infringed work crossed." Ale House Mgnt v. Raleigh Ale House, 205 F.3d 137, 143 (4th Cir. 2000) (citing Towler v. Sayles, 76 F.3d 579, 582 (4th Cir. 1996)). Defendants deny that they had access to the copyrighted plans

13

and that they ever viewed or possessed the plans or copies of the plans. It is undisputed, however, that the Rubins toured the Bainbridge model home, obtained copies of marketing materials which depicted the Bainbridge model, and received a copy of Plaintiff's portfolio, which included an artist's rendering of the Bainbridge.

The Fourth Circuit has not squarely addressed the issue of what constitutes "access" in the context of architectural copyright. Other courts, however, have held that access to simple floor plans constitute sufficient "access" to the copyrighted work even though the architectural drawings, and not the mere floor plans, are actually copyrighted. See Donald Frederick Evans & Assoc., v. Cont'l Homes, Inc., et al, 785 F.2d 897 (11th Cir. 1986) (access to a floor plan printed in a brochure was sufficient to establish the "access" prong of a copyright claim); Imperial Homes Corp. v. Lamont, 458 F.2d 895, 899 (5th Cir. 1972).

Because there is no dispute that Defendants were aware of and had seen Plaintiff's "Bainbridge" design and that Defendants received Plaintiff's portfolio, which included a copy of the simple floor plans of the first and second floors of the Bainbridge, this Court presumes, for the purposes of this Order, that Defendants had access to Plaintiff's designs. See Frank Betz Assoc., Inc. v. J. O. Clark Constr., L.L.C., No. 3:08cv159, 2010 WL 2253541 at *14 (M.D. Tenn, May 30, 2010) (finding access where Defendants "knew about [plaintiff] and its home designs," "knew about [plaintiff's] website," and had received plaintiff's magazine in which the designs at issue had been published).

### C. Substantial Similarity Between the Bainbridge and Defendants' Home

The final element that Plaintiff must demonstrate in order to present a valid claim of copyright infringement is that the two works in question are "substantially similar." The substantial similarity inquiry requires evidence that the later work so closely resembles the

copyrighted work that it must have been wrongfully appropriated. T-Peg, Inc. v. Vermont Timber Works, Inc., 459 F.3d 97, 112 (1st Cir. 2006). In the context of architectural works, substantial similarity is evaluated "'on the basis of the original design elements that are expressive of the [designer's] creativity.'" J.R. Lazaro Builders, Inc. v. R.E. Ripberger Builders, Inc., 883 F. Supp. 336, 343 (S.D. Ind. 1995). Thus, the appropriate focus of the inquiry is not on every element of the copyrighted work, but only on those aspects which are protectable under copyright laws. T-Peg, Inc., 459 F.3d at 112. The threshold questions with respect to the substantial similarity inquiry are, therefore, twofold: first, what is the nature and extent of protection, if any, owed to Plaintiff under the Copyright Act; and second, which components, if any, of Plaintiff's work are original and thereby entitled to protection under the Act?

### 1. Extent and Scope of Copyright Protection

Copyright protection extends to "original works of authorship fixed in any tangible medium of expression . . . ." Copyright Act, 17 U.S.C. §§ 101–122 (2011). The Copyright Act was amended in 1990 to include the Architectural Works Copyright Protection Act ("AWCPA"), which protects "the design of a building as embodied in any tangible medium of expression, including a building, architectural plans, or drawings." 17 U.S.C. § 101; 17 U.S.C. § 102(a)(8). Though the term "architectural work" specifically includes "the overall form as well as the arrangement and composition of spaces and elements in the design," by its own terms, the Act does not protect "individual standard features." 17 U.S.C. § 101. Examples of individual standard features include "common windows, doors, or other staple building components." H.R. Rep. No 101-735 (1990). In addition to standard features, "standard configurations of spaces" are also not protectable. 37 C.F.R. § 202.11(d)(2).

15

Though the Fourth Circuit has not squarely addressed the scope of copyright protection under § 102(a)(8), see Harvester, Inc. v. Rule Joy Trammell + Rubio, LLC, 716 F. Supp. 2d 428, 436 (2010), the extent of protection afforded to architectural works was recently considered in this district. In Harvester, Judge Henry Hudson adopted the Eleventh Circuit's analysis as articulated in Intervest Constr., Inc. v. Canterbury Estate Homes, Inc., 554 F.3d 914 (11th Cir. 2008). In adopting the Intervest court's scope of architectural copyright protection, Judge Hudson explained that although the Eleventh Circuit did not articulate the inquiry as such, consideration of architectural copyright infringement is a two-pronged analysis:  (1) "determine whether there are original design elements present, including the overall shape and interior architecture," (2) "examine whether the design elements are functionally required."  Harvester, 716 F. Supp. 2d at 437 n.10 (quoting Frank Betz Assocs., Inc. v. Signature Homes, Inc., No. 3:06-0911, 2010 WL 1373268 at *3 (M.D. Tenn. 2010)).  While design elements of a structure that are functionally-required cannot be protected by copyright, the Court may consider "evidence that there is more than one method of obtaining a given functional result."  Harvester, 716 F. Supp. 2d at 441.

Courts addressing the "originality" requirement in the unique context of the Architectural Works Copyright Protection Act have consistently held that the standard is "a very low threshold."  The "degree of creativity" necessary to obtain a valid architectural copyright is "so low, the originality requirement amounts to 'little more than a prohibition of actual copying.'" Alfred Bell & Co. v. Catalda Fine Arts, 191 F.2d 99, 103 (2d Cir. 1951).  It has been noted that the concept of "originality" under the Copyright Act does not take its ordinary meaning, but rather "means only that the work was independently created by the author (as opposed to copied from other works), and that it possesses at least some minimal degree of creativity." Axelrod,

16

2007 WL 708798 at *9. Indeed, courts protect modern architectural structures, such as commercial homes, that possess the minimal amount of originality that copyright law requires, as well as the plans from which owners built them." Yankee Candle Co. v. New England Candle Co., 14 F. Supp 2d 154, 158 (D. Mass. 1998).

Because buildings must necessarily include certain standard features which are nonprotectable, "creativity in architecture frequently takes the form of a selection, coordination, or arrangement of unprotectable elements into an original, protectable whole." Intervest, 554 F.3d at 919. Thus, copyright protection extends to a designer's original combination or arrangement of architectural elements even though "individual standard features and . . . ideas or concepts are not themselves copyrightable." Id. For example, while the idea of including a master bedroom in a home, is certainly not protectable, "the original and creative expression of the idea of the location and size of the master bedroom" are protectable. Lindal Cedar Homes, Inc. v. Ireland, No. Civ. 03-6102, 2004 WL 2066742 at *3 (D. Or. Sept. 14, 2004) ("The layout and sizing of home features is enough to gain copyright protection"); Axelrod, 2007 WL 708798 at *11 ("the aspect of architectural design that is protected is the gestalt of the plans including things like an architect's choices regarding shape, arrangement, and location of buildings, the design of open space, the location of parking and sidewalks, and the combination of individual design elements.")

Based on these principles, it is clear that Plaintiff's Bainbridge design is entitled to some measure of protection under the Copyright Act. However, we find that the scope and degree of that protection is quite limited for two distinct, but related reasons. First, many courts have likened architectural works to compilations, which receive only "thin" copyright protection. Feist Publ'ns, Inc. v. Rural Tel. Serv., Inc., 499 U.S. 340, 349 (1991) (protection for compilations is

"thin"); Intervest, 554 F.3d at 919 ("the definition of an architectural work closely parallels that of a 'compilation' . . . copyright protection in a compilation is thin"); Dream Custom Homes, Inc. v. Modern Day Constr., Inc., 773 F. Supp. 2d 1288, 1309 (M.D. Fla. 2011) (finding that the two homes in question were not substantially similar in light of the "thin protection accorded to compilations"); Trek Leasing, Inc. v. United States, 66 Fed. Cl. 8, 12 (Ct. Fed. Cl. 2005) (same). Where, as here, copyright protection for a particular work is "thin," Plaintiff must make a showing of "supersubstantial similarity." Transwestern Publ'g. Co. LP v. Multimedia Mktg Assoc., Inc., 133 F.3d 773, 776 (10th Cir. 1998) ("if substantial similarity is the normal measure required to demonstrate infringement, 'supersubstantial' similarity must pertain when dealing with 'thin' works.").

Second, because Plaintiff's Bainbridge home is modeled after the traditional Georgian style, it heavily borrows from the public domain and is thus entitled to narrower copyright protection than are works that are wholly original. Trek Leasing, 66 Fed. Cl. at 19; Boisson v. Banian, Ltd., 273 F.3d 262, 272 (2d Cir. 2001). Thus, although we agree with Plaintiff that the use of standard Georgian architectural features does not render the copyrighted work unoriginal, we find that Plaintiff's heavy incorporation of this architectural style into its design, coupled with the added constraints imposed by virtue of the copyrighted work's location in Fords Colony, substantially dampen the degree of protection to which Plaintiff is entitled.

## 2. Evaluating Substantial Similarity

To discern whether two structures are "substantially similar," courts have held that "the fact finder must look at the work as a whole without dissection. This entails judging the 'total concept and feel' of the structure, and a fact finder must avoid taking a divide and conquer approach in assessing elements of the work." Axelrod, 2007 WL 708798 at *13. However,

when viewed "through the narrow lens of compilation analysis only the original, and thus protected arrangement and coordination of spaces elements, and other staple building components should be compared." Intervest, 554 F.3d at 919. Moreover, where, as here, copyright protection is thin *and* the work in question lacks substantial originality, a heightened showing of substantial similarity is required. Apple Computer, Inc. v. Microsoft Corp., 35 F.3d 1435, 1439 (9th Cir. 1994); Nimmer on Copyright, § 13.03[A] at 13-28 (1997) (more similarity is required when less protectable matter is at issue).

Typically, a claim of "substantial similarity" in the copyright context is assessed under the "ordinary observer" test, by which courts evaluate similarity based on "the ordinary and reasonable layperson's overall impression of the two works, not on a detailed comparison of the two works, focusing on the individual differences." Bonner, 2003 WL 22432941 at *5. However, where a claimant's work incorporates sources other than its original expression, the "ordinary observer" test is inapplicable. See Boisson v. Banian, Ltd., 273 F.3d 262, 272 (2d Cir. 2001). Instead, the "more discerning observer" test applies, under which courts "distinguish between protectable and unprotectable elements, put the unprotectable elements out of mind, and determine whether the remainders of each work, taken together, are similar in total concept and feel." Trek Leasing, Inc. v. U.S., 66 Fed. Cl. 8, 19 (Ct. Fed. Cl. 2005) (citing Well-Made Toy Mfg. Corp. v. Goffa Int'l Corp., 210 F.Supp.2d 147, 162 (E.D.N.Y. 2002)). In this case, Plaintiff's work undoubtedly incorporates design features that Plaintiff did not independently conjure up. Plaintiff's "Bainbridge" design borrows many of its central features from the traditional Georgian style, thus rendering the more discerning observer test applicable.

In their Amended Complaint, Plaintiffs list thirty-two features common to both the Bainbridge and the Rubins' home that they assert make the homes "substantially similar." (Pl.s

Am. Compl. ¶¶ 35A-FF.) To determine whether the Rubins' home infringes Plaintiffs' copyrighted work, this Court has carefully examined each alleged similarity to determine first whether that feature is protected under the Copyright Act and, if found to be protected, to determine whether the features are so substantially similar as to evince copyright infringement.

### a. Non-Protectable Elements of The Bainbridge

In assessing whether particular features of an architectural work are protectable, courts look to, among others, the following factors: (i) whether those features are simply "individual standard features," (ii) whether those features are essential or common to the architectural style within which the builder designed the structure in question, (iii) whether external restrictions such as building codes and restrictive covenants influenced the nature of the expression and (iv) whether constraints such as costs or space dictated certain design choices. See Intervest, 554 F.3d at 919; Trek Leasing, 66 Fed. Cl. at 20-24 ("elements dictated by efficiency, necessity, or external factors must also be filtered out of the court's infringement analysis" (citing Kohus v. Mariol, 328 F.3d. 848, 856 (6th Cir. 2003)).

A number of the similarities alleged in Plaintiffs' Amended Complaint must necessarily be categorized as "individual standard features" undeserving of protection under the Copyright Act. These include the fact that the plans for both houses (i) include a basement foundation, (ii) have common ceiling heights of ten feet in the basement and on the first floor and nine feet on the second floor, (iii) have architectural shingles on the main body of the home, wings, garage and covered breezeway and (iv) contain windows and doors that are "substantially similar in size and location." (Pl.s Am. Compl. ¶¶ 35B, C, G, P.) That both homes feature "walk-out" basements allowing for ingress and egress at the rear is also standard and not copyrightable. (Pl.s Am. Compl. ¶ 35B.) We further find that the use of the terms "Dining Room," "Foyer,"

20

"Library," "Kitchen," "Master Bedroom," "Master Bath," "Half Bath," and "Garage" is so common that it must be deemed industry standard and not protectable. (Pl.s Am. Compl. ¶¶ 35R-S.) Finally, roughed-in future baths and storage areas in the basement, the presence of a "niche" in a dining room for the storage of china and flatware and second-floor bedrooms with ensuite bathrooms are all so common to modern home design that they are unprotectable. (Pl.s Am. Compl. ¶¶ 35T,V, DD, and EE.)

Moreover, because both the Bainbridge and the Rubins' home are constructed in traditional Georgian style, certain features that Plaintiff alleges to be common to both homes are either indispensable components of the Georgian style or are so common to the same that they cannot be said to be original and deserving of protection. See Trek Leasing, 66 Fed. Cl. 8 at 20-21 (the use of stone and mortar and capstones and parapets was unprotectable under the Copyright Act because such features are very common to the BIA Pueblo Revival Style). Thus, the fact that "[b]oth the Copyrighted Work and the Infringing House are Georgian architectural style" and that both sets of plans depict "a two-story main body flanked by one-story wings" is hardly protectable. (Pl.s Am. Compl. ¶ 35A.) The center-gabled pediment type front entry porch that Plaintiff complains of is also a classic feature of Georgian-style architecture and is therefore neither original nor protectable. (Pl.s Am. Compl. ¶ 35D.)

Indeed, although the exteriors of the Bainbridge and the Rubins' home do, at first blush, look quite similar, the same could be said of Plaintiff's Bainbridge home and Carter's Grove, a prominent Virginia landmark designed and built in classic Georgian style more than two hundred years before Plaintiff conceived of his design. In fact, if one were to cut off from Carter's Grove the portions beyond the first and second corridors at the façade of the house, it would be nearly indistinguishable from the front view of the Bainbridge. Had there been copyright laws in 1750,

21

perhaps the Taliaferro family would have had a copyright which would have precluded the design of Plaintiff's Bainbridge model. This Court would be incredulous to learn that Plaintiff, an architecture firm located in the Williamsburg area, was unfamiliar with nearby Carter's Grove and its classical Georgian features.

That both the Bainbridge and the Rubins' home are located in Ford's Colony also has substantial bearing on the inquiry into whether the homes are substantially similar. As discussed, Ford's Colony is a highly restrictive gated community in which only five styles of homes may be built and which further requires homes to comply with voluminous restrictions stated in the Purchaser's Handbook. Thus, some of the similarities between the Rubins' home and the Bainbridge can be explained by the fact that the strictures of Fords Colony dictated or at least influenced certain stylistic choices on the part of both Plaintiff and Defendant. First, while both plans include a three car garage in a courtyard configuration at the left of the home, such a configuration is standard in Ford's Colony. (Pl.s Am. Compl. ¶ 35E.)   Second, although both houses have masonry walking surfaces in the breezeways, this design is a requirement of Ford's Colony. (Pl.s Am. Compl. ¶ 35F.)   Third, it is true that both plans feature exposed brick foundations and two-story box bays with matching windows on the first floor and basement levels. (Pl.s Am. Compl. ¶¶ 35L, M.)   However, Ford's Colony requires that all foundations exposed to view be brick and that windows in a box bay must match on the first floor and basement levels.

### b.  Potentially Protectable Elements of The Bainbridge

Although many of the design elements with respect to which Plaintiff alleges copyright infringement are nonprotectable, there are several features of the Bainbridge that are original.

<u>The Keeping Room and Covered Veranda</u>

22

Both homes feature a Keeping Room and a covered Veranda supported by columns over a patio. In both sets of plans, the covered Veranda is accessible only from the Great Room and has no exterior access. Plaintiff alleges that "[t]he Keeping Room in both plans is supported by box columns." (Pl.s Am. Compl. ¶¶ 35J, K.)   Defendants, however, deny this and instead assert that the Keeping Room in their plan is built of wood stud construction. Defendants also claim that their Keeping Room, unlike Plaintiff's design, does not have a column between the twin double hung windows. Although there are certain features of the Keeping Room that may be deemed original, we find that the use of a "Keeping Room" in and of itself is not original. Keeping Rooms located off of the Kitchen area are found in many Georgian homes. [2]

### Laundry Room

While most laundry rooms are small and isolated, the Bainbridge features a spacious "Utility/Laundry/Task Center" which has no door and has a generous workspace. Plaintiff describes the space as including a U-shaped counter which runs continuously around the room perimeter, bisected by a sink, and as having a pocket door which separates the room from the kitchen. Plaintiff contends that the selection, arrangement and design of this room constitute an original and protectable element of the plan, and that these concepts were replicated in the Rubins' home. Defendants claim that although both plans have a laundry/utility area, that they are laid out differently, are different in dimension, and have a significantly different "overall look and feel."

### Kitchen

---

[2] See, e.g. Donald A. Gardner Architects, "The Cantabria" House Plan, http://www.dongardner.com/images.aspx?pid=3499&fn=floorplans%5c11951_f.gif&f= (last visited September 30, 2011) (featuring a Keeping Room off of the Kitchen); The Southern Designer, Plans DS13414-10 and DS13511-10, http://www.rickgarner.com/1over3000sqft.htm (last visited September 30, 3011) (same); e-Architectural design, Plan W81303W: Elegant Living, http://www.e-archi.com/?category_name=georgian&paged=4 (last visited September 30, 2011) (same).

The kitchens in both plans open to the Great Room/Salon and feature similar islands and counter tops. However, both parties agree that the kitchen in the Rubins' plans includes a farmhouse sink in a custom island in the center of the kitchen and does not show a sit up bar area at the Keeping Room. Defendants further claim that their kitchen has three distinct countertops, while the copyrighted plan shows five, that the countertops, backsplashes, appliances, trim, paint color and flooring are different in both plans, that the dimensions of the two kitchens are markedly different and that their plan, unlike the copyrighted plan's "sit up bar," does not have a barrier between the Kitchen and Keeping Room but instead has a detailed trim molding.

### c. Differences Between the Rubins' Home and the Bainbridge

In addition to the fact that many of the features of the two homes that Plaintiff claims are "substantially similar" are not protected under the Copyright Act, there are also important differences between the two homes with respect to both protectable and unprotectable features. The mere presence of differences between a copyrighted and an allegedly infringing work does not preclude liability if, in spite of the differences, substantial similarity remains. Mishan & Sons, Inc. v. Mayrcana, Inc., 662 F. Supp. 1339, 1345 (S.D.N.Y. 1987). Indeed, "it is only when 'the points of dissimilarity not only exceed the points of similarity, but indicate that the remaining points of similarity are (within the context of Plaintiff's work) of minimal importance either quantitatively or qualitatively, [that] no infringement results.'" Concrete Masonry Co., Inc. v. Classic Lawn Ornaments, Inc., 843 F.2d 600, 601 (1st Cir. 1988) (quoting 3 Nimmer, The Law of Copyright § 13.03-[B], at 13-43 (1987)). Nonetheless, where, as here, architectural designs are constrained by outside elements such as cost, style, or community restrictions, this Court agrees with the Eleventh Circuit that "modest dissimilarities are more significant than they

may be in other types of art works." See Howard v. Sterchi, 974 F. 2d 1272, 1276 (11th Cir. 1992).

There are myriad differences, albeit many of which are minor when viewed in isolation, between the two homes at issue in the instant case. Although these differences do not mean that the two homes are not substantially similar, the sheer number and scope of these dissimilarities are important with respect to whether the two homes have the same "look and feel." For example, while the Master Bedroom in the copyrighted plans features a single closet, the Rubins' plans have separate his and hers walk-in closets. The Bainbridge exterior is all brick veneer, while the Rubins' plan is brick veneer on the main body with siding on the dependencies and garage. The front door and window dimensions on the two homes show significant differences, as do the dimensions of the dining rooms, great rooms, master bedrooms, laundry rooms, mudrooms, keeping rooms, and kitchens. Additionally, the square footage of the first floor of the copyrighted plan is 2,834 s.f., whereas the Rubins' home measures 2,523 s.f. Only one second-floor bedroom in the copyrighted plan features a walk-in closet, as opposed to all three second-floor bedrooms in the Rubins' plans. These are just a sample of the many features of the two homes which are dissimilar.

Nearly all of the similarities between the Bainbridge and Defendants' home can be attributed to two sources: (i) the fact that both designs are based on the classical Georgian style and (ii) the fact that both homes are located in the highly restrictive Ford's Colony, which dictates as a matter of course many of the design features common to both homes.

We find that there is simply no originality in the exteriors, basement, and second floors of the Bainbridge on which to base any claim of copyright infringement. The front of the home is unquestionably a copy of classic Georgian architecture, and no observer – ordinary or more

25

discerning – would find that the exteriors of these two homes were any more similar than the exteriors of *most* Georgian-style homes in Ford's Colony. Moreover, we find that, once the non-protectable features of the Bainbridge are removed from consideration, there are few similarities left to be considered and thus little original work that Defendant could have impermissibly copied. Our opinion in this matter is grounded in appreciation of the fact that "[t]he mere fact that a work is copyrighted does not mean that every element of the work may be protected. Originality remains the *sine qua non* of copyright." Feist Publications, 499 U.S. at 345 (1991). When the original and protected elements of Plaintiff's work are compared with those of Defendant's design, it is clear that the two homes are not substantially similar, let alone supersubstantially similar.

Therefore, this Court grants Defendant's Motion for Summary Judgment as to Count One. Because Count Two necessarily rises and falls with Count One, this Court grants Defendants' Motion for Summary Judgment as to Count Two.

### 2.  DIGITAL MILLENNIUM COPYRIGHT ACT CLAIMS

To prove a violation of the Digital Millennium Copyright Act, Plaintiff must show that Defendants intentionally and unlawfully removed Plaintiff's name from the copyrighted plans before distributing the copyrighted plans as the allegedly infringing plans. 17 U.S.C. § 1202(b). Although Plaintiff claims that Defendants Olsen Fine Home Builders and BC Graphics removed the information that identified the copyrighted work as the Bainbridge and thereafter distributed the copyrighted plans as their own, Plaintiff provides no evidence to support this contention. Indeed, Plaintiff provides no substantive evidence that Defendants provided or distributed any false copyright information with the intent to induce, enable, facilitate, or conceal infringement,

or that Defendant removed any copyright information." See EsNtion Records, Inc. v. TritonTM, Inc., No. 3:07-CV-2027-L, 2009 WL 3805827 at *9-10 (N.D. Tex. Nov. 13, 2009).

Moreover, this Court finds that the Defendants' plans were not so substantially similar to Plaintiff's copyrighted plans as to support the inference that Defendant's plans are the Bainbridge plans with the copyright information removed. Thus, standing alone, the fact that there are some similarities between the two sets of plans is simply insufficient to support a claim under 17 U.S.C. § 1202(b). Therefore, this Court grants Defendant's Motion for Summary Judgment as to Count Three.

### 3. LANHAM ACT CLAIMS

Plaintiffs final claims assert that Defendants BC Graphics and Olsen Fine Home Builders attempted to pass off Plaintiff's plans as their own, in violation of the Lanham Act, 15 U.S.C. § 1125(a)(1)(A).[3] The Lanham Act "was intended to protect against the 'deceptive and misleading use of marks' and to protect persons engaged in . . . [interstate] commerce against unfair competition.'" 15 U.S.C. § 1127; Sybersound Records, Inc. v. UAV Corp., 517 F.3d 1137, 1143 (9th Cir. 2008) (alterations in original) (citing Dastar v. Twentieth Century Fox Film Corp., 539 U.S. 23, 28 (2003)). A claim brought under the Lanham Act requires that the alleged unfair competition have an effect on interstate commerce. PBM Products, LLC v. Mead Johnson & Co., 639 F.3d 111, 120 (4th Cir. 2011) (the Lanham Act creates a federal cause of action for unfair competition by prohibiting misrepresentation in interstate commerce); Tana v. Dantanna's, 611 F.3d 767, 773 (11th Cir. 2010) (same); Flynn v. Health Advocate, Inc., 169 Fed. Appx. 99, 101(3d Cir. 2006) (same);

---

[3] In its Amended Complaint, Plaintiff states that Defendantscommitted federal unfair competition, in contravention of 28 U.S.C. § 1125(a)(1)(A). The correct citation is 15 U.S.C. § 1125(a)(1)(A).

Plaintiff provides no indication of how Defendants' alleged misleading representations might come to affect interstate commerce. Indeed, Plaintiff, BC Graphics and Olsen Fine Home Builders are all entities operating primarily within the Williamsburg area of Virginia. Plaintiff nowhere provides any evidence that Defendants advertised their allegedly infringing designs anywhere outside of Virginia. In fact, Plaintiff does not contend that Defendants advertised these designs at all. This Court thus finds that, because there is no support for the allegation that Defendants engaged in unfair competition affecting interstate commerce, Plaintiff's Lanham Act claim must fail. Because the plans which form the basis of this dispute have no apparent relation to interstate commerce, Count Four of Plaintiff's Complaint is dismissed without prejudice.

## IV.  **CONCLUSION**

It is interesting to note that the eighteen designs pictured in "Places to Call Home" encompass most designs utilized in the Williamsburg area. Indeed, it is difficult to conceive that similar houses could be built anywhere within this area without being questioned if the proposed builder had ever received a copy of "Places to Call Home."

For the reasons stated herein, Defendants' Motions for Summary Judgment are **GRANTED** as to **COUNTS ONE, TWO, and THREE. COUNT FOUR** is **DISMISSED WITHOUT PREJUDICE** for lack of jurisdiction. The Clerk of Court is **DIRECTED** to transmit a copy of this Order to all counsel of record.

**IT IS SO ORDERED**.

Newport News, Virginia

Robert G. Doumar
Senior United States District Judge

September __24__, 2011

28