IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
NEWPORT NEWS DIVISION

```
┌─────────────────────────────┐
│          FILED              │
│   ┌──────────────────┐      │
│   │  SEP 3 0 2013    │      │
│   └──────────────────┘      │
│  CLERK, U.S. DISTRICT COURT │
│        NORFOLK, VA          │
└─────────────────────────────┘
```

CHARLES W. ROSS BUILDER, INC.
d/b/a CHARLES ROSS HOMES,

    Plaintiff

    v.                                    **CIVIL NO. 4:10cv129**

OLSEN FINE HOME BUILDING, LLC,

BEVERLY OLSEN,

BOATHOUSE CREEK GRAPHICS,
INC.,

RICK J. RUBIN, and

JENNIFER L. RUBIN

    Defendants.

## OPINION AND ORDER GRANTING DEFENDANTS' RENEWED MOTIONS FOR SUMMARY JUDGMENT

## CONTENTS

I.    PROCEDURAL HISTORY ................................................................4

II.    FACTUAL BACKGROUND ............................................................6

    A.    FORD'S COLONY .......................................................................7

    B.    COLONIAL GEORGIAN ARCHITECTURE ............................................10

    C.    PLAINTIFF'S "BAINBRIDGE" MODEL AND THE RUBIN RESIDENCE .....................12

III.    SUMMARY JUDGMENT STANDARD .................................................15

IV.    DISCUSSION ......................................................................17

    A.    VALIDITY OF PLAINTIFF'S COPYRIGHTS ...........................................18

    B.    CIRCUMSTANTIAL EVIDENCE OF COPYRIGHT INFRINGEMENT ...........................19

        1.    Defendants' Access to the Bainbridge Home Design ...................................20

a.    The Rubins' Access to the Bainbridge Design ..........................................21

b.    Boathouse Creek's Access to the Bainbridge Design...............................21

      i.    *Intermediary Access by Boathouse Creek*...........................................22

      ii.    *Direct Access by Boathouse Creek*......................................................29

c.    Olsen Fine Homes and Beverly Olsen's Access to the Bainbridge
    Design ....................................................................................................31

      i.    *Intermediary Access by the Olsens* .....................................................31

      ii.    *Direct Access by the Olsens*.................................................................33

2.    **Substantial Similarity Between Plaintiff's Bainbridge Design and
the Rubin Residence** ......................................................................................36

a.    Extrinsic Similarity .............................................................................37

      i.    *Extent and Scope of Copyright Protection for Plaintiff's
Bainbridge Design*...............................................................................38

      ii.    *Extrinsic, Substantial Similarity Between the Protectable
Features of the Bainbridge Design and the Rubin Residence*............44

b.    Intrinsic Similarity ..............................................................................46

V.    **CONCLUSION** .........................................................................................................47

This matter comes before the Court upon the filing or Renewed Motions for Summary Judgment by: (1) Olsen Fine Home Building, LLC; (2) Beverly Olsen; (3) Boathouse Creek Graphics, Inc.; (4) Rick J. Rubin; and (5) Jennifer L. Rubin (collectively "Defendants"). Olsen's Ren. Mot. for Summ. J., ECF No. 115; Boathouse's Ren. Mot. for Summ. J., ECF No. 119; Rubins' Ren. Mot. for Summ. J., ECF No. 121. The Court has subject matter jurisdiction over Charles W. Ross Builder, Inc.'s ("Plaintiff") Amended Complaint, which alleges violations of the: (1) Federal Copyright Act, 28 U.S.C. § 101, et seq.; (2) Digital Millennium Copyright Act, 17 U.S.C. § 1202(b); and (3) Lanham Act, 15 U.S.C. § 1051 et seq. Pl.'s Am. Compl., ECF No. 21.

Plaintiff is a custom home designer and builder operating primarily in the Williamsburg area of Virginia. Plaintiff is a corporation existing under the laws of the Commonwealth of

Virginia and has its principal place of business in Williamsburg, Virginia. Pl.'s Am. Compl. ¶ 2, ECF No. 21.

Defendants Rick and Jennifer Rubin (collectively "the Rubins") are individuals who constructed a single-family home ("the Rubin residence") in the Ford's Colony subdivision of Williamsburg are of James City County, Virginia. Defendant Boathouse Creek Graphics, Inc. ("Boathouse Creek") is the residential design corporation that designed the Rubin residence. Boathouse Creek's President is Lisa Sawin ("Sawin"),[1] and it is organized and exists under the laws of the Commonwealth of Virginia with a principal place of business in Yorktown, Virginia. Defendant Olsen Fine Home Building, LLC ("Olsen Fine Homes") is a builder in the Williamsburg area that constructed the Rubin residence based on dwelling utilization plans drawn up by Boathouse Creek. Defendant Beverly Olsen ("Olsen") owns Olsen Fine Homes (collectively, "the Olsens"), and has reportedly constructed at least eight houses in the Ford's Colony subdivision where the Rubin residence is located.

This is a copyright infringement suit concerning the Rubin residence. Plaintiff's Amended Complaint alleges that, prior to beginning construction of their residence, the Rubins: (1) toured a copyrighted model of Plaintiff's "Bainbridge" model home ("Bainbridge" or "the copyrighted work"); (2) received a "For Sale" brochure with photos and sales prices during the tour; and (3) later received an unsolicited promotional brochure which contained floor plans for many different homes, including the Bainbridge. It is alleged that the Rubins subsequently contracted with Defendants Boathouse Creek and the Olsens to design and construct a home substantially similar to the Plaintiff's copyrighted Bainbridge design.

---

[1] Lisa Sawin was formerly known as "Lisa Moberg," but her name changed after Plaintiff filed its Complaint. ECF No. 1.

For the reasons set forth herein, the Court **GRANTS** Defendants' Renewed Motions for Summary Judgment. Olsen's Ren. Mot. for Summ. J., ECF No. 115; Boathouse's Ren. Mot. for Summ. J., ECF No. 119; Rubins' Ren. Mot. for Summ. J., ECF No. 121.

## I.    PROCEDURAL HISTORY

On November 24, 2010, Plaintiff filed an Amended Complaint alleging: (1) federal copyright violations against all Defendants (Count One); (2) that the Rubins contributed to or induced said copyright infringement (Count Two); (3) violations of the Digital Millennium Copyright Act by Boathouse Creek and the Olsens (Count Three); and (4) unfair competition by Boathouse Creek and the Olsens (Count Four). Pl.'s Am. Compl., ECF No. 21.

On February 14, 2011, Defendants filed their Original Motions for Summary Judgment. Rubins' Orig. Mot. for Summ. J., Feb. 14, 2011, ECF No. 38; Olsen's Orig. Mot. for Summ. J., Feb. 14, 2011, ECF No. 40; Boathouse's Orig. Mot. for Summ. J., Feb. 14, 2011, ECF No. 44. On February 21, 2011, Plaintiff filed a Memorandum in Opposition, ECF No. 52, to those Original Motions for Summary Judgment. Each Defendant subsequently filed a Response to Plaintiff's Opposition Memorandum. Olsen's Reply to Pl.'s Mem. in Opp., Feb. 21, 2011, ECF No. 53; Rubins' Reply to Pl.'s Mem. in Opp., Feb. 22, 2011, ECF No. 54; Boathouse's Reply to Pl.'s Mem. in Opp., Feb. 28, 2011, ECF No. 56. On June 28, 2011, the parties appeared before the Court for a hearing concerning Defendants' Original Motions for Summary Judgment. On September 29, 2011, the Court issued an Opinion and Order: (1) granting the Defendants' Motions as to Counts One, Two, and Three; and (2) dismissing Count Four, without prejudice, for lack of jurisdiction. Op. & Ord., ECF No. 67. In doing so, the Court found that the Rubin residence was not "substantially similar" to Plaintiff's copyrighted work based on the "more discerning observer," which had been relief upon by other courts to assess copyright

4

infringement in the architectural context. Op. & Ord. 19, ECF No. 67 (citing <u>Trek Leasing. Inc. v. U.S.</u>, 66 Fed. Cl. 8, 19 (Ct. Fed. Cl. 2005)).

On October 28, 2011, Plaintiff filed a Notice of Appeal. ECF No. 79. Plaintiff appealed the Court's decision with respect to Counts One and Two of the Amended Complaint, but did not appeal as to Counts Three or Four. On appeal, Plaintiff argued that the undersigned reached an incorrect result by failing to apply the Fourth Circuit's "substantial similarity" test developed in <u>Universal Furniture International, Inc. v. Collezione Europa USA, Inc.</u>, 618 F.3d 417 (4th Cir. 2010), which involved copyright infringement with respect to furniture design. On November 8, 2012, the Fourth Circuit issued an Opinion finding that the test set forth in <u>Universal Furniture</u> extends to architectural works and, therefore, should control the Court's consideration of this matter. Op. of USCA, ECF No. 109. Thus, the Fourth Circuit vacated the September 29, 2011 Opinion and Order granting Defendants' Original Motions for Summary Judgment and remanded the matter for further proceedings.

After remand, Defendant each filed <u>Renewed</u> Motions for Summary Judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure. Olsen's Ren. Mot. for Summ. J., Nov. 30, 2012, ECF No. 115; Boathouse's Ren. Mot. for Summ. J., Dec. 21, 2012, ECF No. 119; Rubins' Ren. Mot. for Summ. J., Dec. 21, 2012, ECF No. 121. On January 4, 2013, Plaintiff filed its Opposition Memorandum. Pl.'s Mem. in Opp. to Ren. Mots. for Summ. J., ECF No. 123. Each defendant then filed replies to Plaintiff's opposition. Boathouse's Reply to Pl.'s Mem. in Opp. to Ren. Mots. for Summ. J., Jan. 10, 2013, ECF No. 124; Olsen's Reply to Pl.'s Mem. in Opp. to Ren. Mots. for Summ. J., Jan. 14, 2013, ECF No. 125; Rubins' Reply to Pl.'s Mem. in Opp. to Ren. Mots. for Summ. J., Jan. 17, 2013, ECF No. 126.

On June 3, 2013, the parties appeared before the undersigned for a hearing concerning the Renewed Motions for Summary Judgment. Min. Entry, ECF No. 133. During the course of that

hearing, the Court inquired as to Plaintiff's argument concerning Olsen's access to the copyrighted work. In response, Plaintiff's counsel directed the Court to a portion of Sawin's deposition and suggested a desire for additional discovery. The Court inquired as to what additional discovery Plaintiff sought, and in response Plaintiff's counsel requested an opportunity to: (1) depose Beverly Olsen; and (2) take unspecified written discovery. The Court ordered Olsen's deposition, but denied Plaintiff's request for written discovery, for which no justification had been advanced.

Plaintiff took Beverly Olsen's deposition on June 11, 2013 and filed a Notice of Filing of Deposition Transcript on June 21, 2013. ECF No. 124. Plaintiff also filed, on June 21, 2013, a Motion for Leave to File Supplemental Affidavit, ECF No. 135, and Memorandum in Support thereof, ECF No. 136. On September 26, 2013, the Court issued an Opinion and Order denying Plaintiff's Motion to File Supplemental Affidavit, having found that: (1) Plaintiff failed to comply with Rule 56(d) of the Federal Rules of Civil Procedure; and (2) such noncompliance was inexcusable. ECF No. 141.

## II.    FACTUAL BACKGROUND

This case presents a novel situation in the area of architectural copyright law because of the myriad influences dictating nearly every design element of the two home designs at issue in this litigation. These governing forces all originate from the simple fact that both of the homes at issue are designed in traditional Georgian style and are located in the Ford's Colony subdivision of historic Williamsburg, Virginia, which renders them subject to that subdivision's design requirements.

In developing the factual predicate that will guide the Court's consideration of the Renewed Motions for Summary Judgment, the Court must "view[] all facts and draw[] all reasonable inferences in the light most favorable to the nonmoving party." Bldg. Graphics, Inc.

6

v. Lennar Corp., 708 F.3d 573, 578 (4th Cir. 2013) (citing Ga. Pac. Consumer Prods., LP v. Von Drehle Corp., 618 F.3d 441, 445 (4th Cir. 2010)). "Summary judgment is only appropriate if there is no genuine dispute of material fact." Id. (citing Fed. R. Civ. P. 56(a)).

## A.    FORD'S COLONY

Ford's Colony is one of the largest, if not the largest, gated communities in Virginia. It comprises 3,000 lots, 2,238 individual residences, three golf courses, swimming pools, tennis courts, several recreational facilities, and a Marriott Resort Area.

The subdivision sits in the heart of the Williamsburg area in James City County, Virginia—also home to the historic College of William and Mary. The second oldest college in the country, the school was chartered in 1693 by King William III and Queen Mary II of England, and broke ground on the Sir Christopher Wren Building in 1695. The Wren Building, designed by famed British architect Sir Christopher Wren, served as the main building of the college in this early period. The building exemplifies the balance and proportion uniquely characteristic of early colonial architecture and is generally accorded to mark the beginnings of colonial architecture, which was the forerunner of Georgian-style architecture in Virginia.

Following the construction of the Wren Building, the Georgian style became the Colonial vogue in Williamsburg, as demonstrated by the numerous other residences in the area famous for their adherence to the boxy, symmetrical style. Indeed, James City County houses both "Westover Plantation" and "Carter's Grove," each of which are widely recognized as early examples of the Georgian style. See e.g., Hugh Morrison, Early American Architecture: From the First Colonial Settlements to the National Period 347 (1987); William Rotch Ware, The Georgian Period: A Series of Measured Drawings of Colonial Work, Part 6 26-35, 40-44 (1900). Westover Plantation was constructed in 1750 by William Byrd, III. Carter's Grove was built

around the same time by King Carter for his grandson, Carter Burwell, and was designed by, among others, the Taliaferros, a prominent Virginia family still living in the area.

In light of its close proximity to historic Colonial Williamsburg, development in Ford's Colony is strictly limited to traditional architecture styles "indigenous to the colonial Virginia area." Ford's Colony Envtl. Control Comm., Purchaser's Handbook for Single Family Homebuilding at Ford's Colony 3 (2008) [hereinafter "Purchaser's Handbook"], available at http://www.fordscolony.com/assets/documentLibrary/fcw_purchasers_handbook.pdf. This is in accord with the stringent residential restrictions that apply to all Ford's Colony properties. In fact, only five architectural styles are permitted in the expansive subdivision: (1) Colonial; (2) Georgian; (3) Classical Revival (a/k/a Jefferson); (4) Federal (a/k/a Adam); and (5) Greek Revival. Id. at 11; see also Ford's Colony Williamsburg, http://www.fordscolony.com (last visited September 25, 2013) (listing acceptable design styles, though removing "Classic Revival" since the Court visited the site on February 25, 2013, which is viewable by following the "For Buyers" drop-down menu, then clicking on "Custom Home Styles").

The Environmental Control Committee ("ECC"), a development oversight body, was established to "provide reasonable and objective control over site planning, architecture, and landscaping design" within Ford's Colony. Purchaser's Handbook, supra, at 3. The ECC must approve the design of any and all homes in Ford's Colony. To this end, the ECC maintains a 103-page Purchaser's Handbook which sets forth guidelines and ECC policies concerning the construction of exterior improvements. See Id. at 3.

The ECC requires that custom homes be "as authentic as practical," and cautions that "[m]ixtures of architectural styles in one building will not normally be approved." Id. at 11 ("For example, a traditional home of the Georgian period should respect the details and

8

disciplines of that period and not include designs of other eras."). The Ford's Colony website offers guidance on characteristic features of each architecture style, and specifically notes that "Georgian Colonial homes usually have these features: Square, symmetrical shape; Paneled front door at center; Decorative crown over front door; Flattened columns on each side of door; Five windows across front; Paired chimneys; Medium pitched roof; Minimal roof overhang." Ford's Colony Williamsburg, http://www.fordscolony.com (last visited September 25, 2013) (follow "For Buyers" drop-down menu, click on "Custom Home Styles," then click on "Georgian" hyperlink on left side of screen).

The Purchaser's Handbook devotes more than 30-pages to pictorial examples of permissible and impermissible design details. For example, lone transom windows, such as might be used to light a shower or closet, are expressly disallowed. Purchaser's Handbook, supra, at 99 (Ex. VI-31). Likewise, dormers may not feature siding detail, id. at 101 (Ex. VI-33), and dormers accented with circle head windows must be designed such that the circle head projects into the pediment. Id, at 102 (Ex. VI-34). The Handbook specifies that spacing between the top of a garage door and the frieze board may not exceed four feet, id. at 100 (Ex. VI-32), and provides numerous drawn depictions of permissible cornice detail, deck column detail, chimney elevation and detail, entry pediment elevation, dormer detail, and the like. Id. at 69-103 (Ex. VI-1 to VI-36). The Handbook suggests preferred paint colors, and specifically directs purchasers to the "Historic Williamsburg" paint line by Pratt & Lambert or the "Historic Colors" line by Benjamin Moore & Co. Id. at 11.

It is under the ECC's close scrutiny that designers, such as Plaintiff and Defendants Boathouse Creek and the Olsens, design and construct custom homes in conformity with the Purchaser's Handbook and the rigidly restrictive covenants of Ford's Colony. It is, therefore, not

9

surprising that many homes in the colonial neighborhood, particularly homes built in the same architectural style, resemble each other to a substantial degree. See Def.'s Orig. Mot. for Summ. J., Ex. 7, ECF No. 44 (twenty-one photographs of Georgian-style homes in Ford's Colony all displaying common elements of Georgian architecture). Indeed, the Purchaser's Handbook even anticipates "essentially complete duplications of exterior architectural design," although it requires that such anticipated duplications not be visually in range of each other. Purchaser's Handbook, supra, at 12 (emphasis added).

## B.    COLONIAL GEORGIAN ARCHITECTURE

The Georgian style, as first interpreted by Italian architect Andrea Palladio, dominated the British and Colonial architectural vogue from 1714 through approximately 1837. Ingrid Cranfield, Georgian House Style: An Architectural and Interior Design Source Book 15 (1997); 5 The New Encyclopedia Britannica 204 (15th ed. 2005). Palladio emphasized proportion, requiring that "the halls . . . be the central axis of the building and the rooms . . . be arranged symmetrically." Cranfield, supra, at 16. Additional features typifying the Palladian style included houses of "red brick with white-painted wood trim. Interiors had central halls, elaborately turned stair balustrades, paneled walls painted in warm colours[,] and white plaster ceilings." 13 The New Encyclopedia Britannica, at 960.

Around 1760, the Georgian style gradually integrated the Adam or neo-Classical style, a Greek revival pioneered by Robert and James Adam. Cranfield, supra, at 21–22. The Adam style incorporated: (1) curved interior walls in staircase halls; (2) arches on landings and passageways; (3) ornamental Venetian windows; (4) doorways with pilasters separating the door from side lights; and (5) fanlight arches covering the entire doorway. Id. at 22–23. The Adam brothers "paid attention not only to decoration per se but also to furnishings, variety in room shapes[,] and the balance between the configuration of floors with that of walls and ceilings." Id.

Beginning in about 1790, Georgian style experienced a third amalgamation called the Regency period, which "was not . . . a definite style—rather a matter of 'trimmings.'" Id. at 24. "On the whole, architecture at this time reflected a change in mood towards a more casual and playful, less orthodox and formal style." Id. Features of this period included

> battlemented and indented parapets; pointed casement windows with tracery in the heads, margin lights and drip moulds above them; pointed doorcases with shafts or reeding up the sides and meeting at the top in an arch; hooded or unhooded wrought- or cast-iron balconies on windows and porches; shallow, curved bays often running the full height of the building; and shallow-pitched roofs.

Id. at 24-25.

Taken together, the three phases comprising the Georgian period form a style generally characterized by: (1) symmetry; (2) aligned windows; (3) gambrel, gabled, or hipped roofs; (4) paneled doors accentuated by classical pilasters and a proportioned, pedimented entablature; (5) rectangular or half-round transom lights, side lights, and elliptical fanlights; (6) double-hung windows typically six over six; and (7) front entrances framed by pilasters and an entablature but no covered porch supported by columns. John Milnes Baker, American House Styles: A Concise Guide 42–47 (1994). Thus, the fundamentals of Georgian-style architecture were well-established centuries ago, and the decision to construct a Georgian-style home necessarily determines many aspects of the home's interior and exterior architectural design. As explained at Part IV(B)(2)(a)(i) of this Opinion and Order, the scope of copyright protection due Plaintiff's Bainbridge design is necessarily limited given its heavy reliance on design elements and configurations common to traditional, Georgian-style architecture, as well as the requirements of the covenants which apply to homes constructed within Ford's Colony.

### C.   PLAINTIFF'S "BAINBRIDGE" MODEL AND THE RUBIN RESIDENCE

Turning to the instant case, in the spring of 2009, Defendants Rick and Jennifer Rubin toured a Bainbridge model home designed, constructed, and copyrighted as a technical drawing and architectural work by the Plaintiff. The Bainbridge model home is located within Ford's Colony. The Rubins took a "For Sale" brochure with photos and sale prices as they left the tour. See Rick Rubin Aff. ¶¶ 1, 6, 12, ECF No. 38-1; Jennifer Rubin Aff. ¶¶ 1, 10, ECF No. 38-2. The brochure supplied to the Court did not include a floor plan or indicate that the Bainbridge is a copyrighted architectural work. See Pl.'s Am. Compl. Ex. 4, ECF No. 21-4.

On or about May 21, 2009, the Rubins contacted Plaintiff to schedule a meeting to discuss the construction of their custom home. Pl.'s Mem. in Opp. to Ren. Mots. for Summ. J. 5, ECF No. 123. The meeting was scheduled for June 3, 2009, but the Rubins canceled the meeting shortly thereafter, apparently because Rick Rubin felt that the person responsible for scheduling on Plaintiff's behalf had been abrupt and unpleasant. On or about May 22, 2009, Plaintiff mailed the Rubins an unsolicited, complimentary copy of its portfolio entitled Places to Call Home. That portfolio is 40-pages long and features 18 of Plaintiff's home designs, including the Bainbridge. Rick Rubin states that he received the Places to Call Home portfolio sometime after he canceled the June 3, 2009 meeting. Rick Rubin Aff. ¶¶ 4-7, ECF No. 38-1. Sometime thereafter, the Rubins employed Boathouse Creek to design, and the Olsens to construct, a custom Georgian-style home with the Ford's Colony subdivision.

Plaintiff's Places to Call Home portfolio forms the basis for this suit. An artist's rendering of the front elevation of the Bainbridge with detached garage, as might be viewed from the street, appears on the 26th page of the portfolio. Drawings of the Bainbridge's first and second floor plans appear on the 27th page. There is no artist's rendering of the Bainbridge's rear or side elevations, except to the extent that those elevations are visible from the front-

elevation rendering on page 26. Nor does the <u>Places to Call Home</u> portfolio provide floor plans for the basement or dormer floor, which is the third floor above the ground that, according to the artist's rendition on page 26, has three dormers. <u>See</u> <u>Places to Call Home</u> 5, ECF No. 21-6 (providing select pages from <u>Places to Call Home</u>, whereas the Court has been furnished with a complete copy of the portfolio).

Below the artist's rendition of the Bainbridge's front elevation on page 26, the <u>Places to Call Home</u> portfolio states: "The traditional Georgian exterior of this home belies a floor plan designed for modern life styles." Pl.'s Am. Compl. Ex. 5, at 4, ECF No. 21-6. Beneath the floor plan on page 27, the portfolio further provides: "Copyright 2006 Charles Ross Homes." Pl.'s Am. Compl. Ex. 5, at 5, ECF No. 21-6. The second to last page of the portfolio states: "No portion of any plan may be reproduced or utilized in any form or by any means without the express permission of Charles Ross Homes. Charles Ross Homes retains the exclusive right to construct the plans within a 50-mile radius of Williamsburg, Virginia." Pl.'s Am. Compl. Ex. 5, at 6, ECF No. 21-6. Thus, Plaintiff claims the exclusive right to construct the 18 home designs featured in the <u>Places to Call Home</u> portfolio—not only in the city of Williamsburg, where Ford's Colony is located, but also the cities of Newport News, Hampton, and Norfolk, as well as parts of Suffolk, Chesapeake, and Virginia Beach. It is this portfolio upon which Plaintiff seeks to establish its claims.

Plaintiff's Bainbridge design is an all brick, Georgian-style home with a two-story rectangular main body flanked by single-story dependencies and a detached, three-car garage connected by covered breezeway. The Bainbridge features two double-hung (sash) windows on either side of a single, centered panel door, five double-hung (sash) windows across the second story and three dormers across a gabled roof. A half-round window is displayed in both gable

ends. The dormer motif is not carried over to the garage, though the garage mirrors the home with a half-round window in each gable end. The home includes dentil mould on all front cornicing and over the doorway, brick jack arches above each of the windows, shutters, paired interior chimneys, and louvered rectangle vents. The Bainbridge's single, centered paneled front door is highlighted by side lights and a rectangular transom set beneath a corresponding rectangular, covered-entry pediment.

The Bainbridge's interior presents typical Georgian balance expressed as a centered foyer symmetrically flanked by a dining room and library. The foyer leads to an open concept floor plan that connects a two-story great room to a kitchen and keeping room on the left, and a lower-level master suite on the right. The main body of the home, including the veranda, forms a perfect rectangle such that the dining room, kitchen, and keeping room share the same width. The veranda, great room, and foyer/library also share a similar width.

It also appears that, with respect to the layout of the rooms, the floor plan of the first floor of the Bainbridge is in accordance with classic Georgian style, as exemplified by the remarkably similar first floor layouts of: (1) 219 Chestnut Lane, available at Stephen Fuller Designs, http://www.stephenfullerhouseplans.com/plan_details_print.php?pid=5791 (last visited September 25, 2013); (2) "The Capistrano," available at Donald J. Gardner Designs, http://www. dongardner.com/images.aspx?pid=3938&fn=floorplans%5c1227d1_f.gif&f= (last visited September 25, 2013); and (3) the "Georgia Peach," available at http://www.eplans.com/house-plans/epl/styles/colonial-homes-and-house-plans/hwepl02550.html (last visited September 25, 2013). In fact, the only apparent difference between the Bainbridge and these three sets of first floor plans is the size of the rooms and that the "Keeping Room" and "Veranda" of the Bainbridge are, respectively, called a: (1) "Breakfast Nook" and "Deck" in 219 Chestnut and the

14

Georgia Peach; and (2) "Hearth Room" and "Porch" in The Capistrano. Thus, there does not appear to be anything materially different between the aforementioned floor plans, readily available on the Internet, and those floor plans displayed in the Bainbridge's promotional materials.

The Rubin residence, on the other hand, presents as a two-story brick veneer main body flanked by single-story veneer siding dependencies connected by breezeway to a veneer siding three-car garage. The five second-story, double-hung (sash) windows balance five gabled dormers. The use of dormers is further carried over to the garage, which features three gabled dormers and rectangular windows in both the front and back gables. The Rubin residence includes paired end chimneys which run the full height of the house. The Rubins' two, centered paneled front doors are unaccompanied by a side lights or a transom.

The interior of the Rubins' home adheres to traditional Georgian emphasis on symmetry with a centered foyer that bisects a dining room and library on the first floor. Like the Bainbridge, and presumably like many other Georgian styles homes, the main body of the home forms a perfect rectangle such that the dining room, kitchen, and keeping room share the same width, and likewise the veranda, great room, and foyer/library share a similar width.

## III.  SUMMARY JUDGMENT STANDARD

Pursuant to Rule 56 of the Federal Rules of Civil Procedure, a court shall grant a motion for summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Summary judgment is warranted "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). "One of the

15

principal purposes of the summary judgment rule is to isolate and dispose of factually unsupported claims or defenses." Id. at 323–24.

The movant bears the initial burden of demonstrating the absence of a genuine issue of material fact. Id. at 323. In evaluating whether that burden is met, a court "must "view[] all facts and draw[] all reasonable inferences in the light most favorable to the nonmoving party." Bldg. Graphics, Inc., 708 F.3d at 578 (citing Ga. Pac. Consumer Prods., 618 F.3d at 445). If the movant makes a prima facie showing that there is no genuine issue of material fact, the nonmoving party must: (1) cite to particular parts of materials in the record that shows a fact is genuinely disputed; or (2) show that materials cited by the movant fails to establish the absence of a genuine dispute. Fed. R. Civ. P. 56(c)(1). The Court must ultimately decide "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 251-52 (1986).

In the context of copyright infringement claims, a court may properly determine non-infringement of copyright as a matter of law either when: (1) a plaintiff fails to marshal sufficient evidence to support a finding that there exists a reasonable possibility the defendant had access to the copyrighted work, Bldg. Graphics, Inc., 708 F.3d at 578 (quoting Ale House Mgmt., Inc. v. Raleigh Ale House, Inc., 205 F.3d 137, 143 (4th Cir. 2000) (citing Armour v. Knowles, 512 F.3d 147, 152–53 (5th Cir. 2007)); Art Attacks Ink, LLC v. MGA Entm't Inc., 581 F.3d 1138, 1143 (9th Cir. 2009)); (2) the alleged similarities concern only non-copyrightable material, see Universal Furniture, 618 F.3d at 436 (stating that the district court "would have erred had it found similarity only in the collection's noncopyrightable features") (citing Herzog v. Castle Rock Entm't, 193 F.3d 1241, 1257 (11th Cir. 1999)); or (3) no reasonable trier of fact

could find the two works in question to be substantially similar, Walker v. Time Life Films, Inc., 784 F.2d 44, 48 (2d Cir. 1986) (citing Warner Brothers v. American Broadcasting Co., 720 F.2d 231, 240 (1983)); Smith v. Jackson, 84 F.3d 1213, 1218 (9th Cir. 1996) (citing Kouf v. Walt Disney Pictures & Television, 16 F.3d 1042, 1045 (9th Cir. 1994)).

In fact, the Eleventh Circuit has held that summary judgment is particularly appropriate where: (1) access has been established and the crucial issue is substantial similarity; (2) there may be substantial similarity with respect to non-copyrightable elements of the two works; and (3) as to non-protectable elements, there are substantial differences between the two works. Intervest Constr., Inc. v. Canterbury Estate Homes, Inc., 554 F.3d 914, 920 (11th Cir. 2008). As that Court stated in Intervest, "when the crucial question in a dispute involving compilations is substantial similarity at the level of protectable expression, it is often more reliably and accurately resolved in a summary judgment proceeding . . . because the judge is better able to separate original expression from the non-original elements of a work." Id. (emphasis added).

## IV.   DISCUSSION

"To establish a claim for copyright infringement, a plaintiff must prove that it owned a valid copyright and that the defendant copied the original elements of that copyright." Bldg. Graphics, Inc., 708 F.3d at 578 (emphasis added) (quoting Lyons P'ship, L.P. v. Morris Costumes, Inc., 243 F.3d 789, 801 (4th Cir. 2001)). "Copying can be proven through direct or circumstantial evidence." Id. (quoting Lyons, 243 F.3d at 801). When direct evidence is lacking, a plaintiff may create a presumption of copying by indirect evidence establishing that: (1) it is "reasonably possible" the defendant had access to the copyrighted work; and (2) the defendant's work is "substantially similar" to the protected elements of the copyrighted work. Id.

A.    VALIDITY OF PLAINTIFF'S COPYRIGHTS

"A certificate of registration issued by the Copyright Office is 'prima facie evidence of the validity of the copyright and of the facts stated in the certificate,' such as ownership. When such a certificate exists, the burden shifts to the defendant to prove that the claimed copyrights are invalid." Universal Furniture, 618 F.3d at 428 (internal citations omitted) (quoting M. Kramer Mfg. Co. v. Andrews, 783 F.2d 421, 434 (4th Cir. 1986)) (citing 17 U.S.C. § 410(c)); see 17 U.S.C. § 410(c) ("[T]he certificate of a registration made before or within five years after first publication of the work shall constitute prima facie evidence of the validity of the copyright and of the facts stated in the certificate.").

Statute and case law dictate that, like a patent, the existence of a certificate of copyright carries a presumption of originality. See, e.g., Swirsky v. Carey, 376 F.3d 841, 851 (9th Cir. 2004); Modern Publ'g, a Div. of Unisystems, Inc. v. Landoll, Inc., 841 F. Supp. 129, 132 (S.D.N.Y. 2004); 17 U.S.C. § 410(c). The Court, however, finds it essential to highlight the difference between patents and copyrights. A patent examiner determines the novelty of an invention prior to issuance of a patent. To secure a certificate of copyright, however, one merely needs to file his or her copyright. There is no originality analysis prior to issuance of a copyright certificate. Because "the Copyright Office tends toward cursory issuance of registrations," the Fourth Circuit has held that the presumption of originality which rides on the coattails of a copyright certificate is fairly easy to rebut. Universal Furniture, 618 F.3d at 430.

Plaintiff has tendered copies of its copyright registration certificates for the Bainbridge design. Pl.'s Am. Compl. Ex. 1, ECF No. 21-1 (copyright as architectural work); Pl.'s Am. Compl. Ex. 2, ECF No. 21-2 (copyright as technical drawing). Defendants do not contest the

validity of Plaintiff's copyrights as to the alleged original elements.[2] The Court will, therefore, proceed on the presumption that Plaintiff owns a valid copyright on the Bainbridge design.

### B.   CIRCUMSTANTIAL EVIDENCE OF COPYRIGHT INFRINGEMENT

Plaintiff relies on circumstantial evidence to establish its claim that Defendants copied the Bainbridge design. See generally Pl.'s Am. Compl., ECF No. 21; Pl.'s Mem. in Opp. to Ren. Mots. for Summ. J., ECF No. 123. Defendants, however, argue non-infringement of copyright as a matter of law because: (1) Plaintiff fails to marshal sufficient evidence that each Defendant had a reasonable possibility of access to the Bainbridge design; and (2) no reasonable juror could find that the Bainbridge and Rubin residence are substantially similar as to the original elements.

For the reasons set forth in Part III(B)(1) of this Opinion and Order, the Court **FINDS** that Plaintiff: (1) marshals sufficient evidence to raise a genuine issue of material fact concerning the Rubins' access to the Bainbridge design; but (2) fails to marshal sufficient evidence to raise a genuine issue of material fact concerning access by Boathouse Creek and the Olsens.

For the reasons set forth in Part III(B)(2) of this Opinion and Order, the Court further **FINDS** that no reasonable juror could find that the Bainbridge and Rubin residence are substantially similar as to the original elements.

The Court, therefore, **FINDS** that Plaintiff cannot sustain its claims of copyright infringement and **GRANTS** Defendants' Renewed Motions for Summary Judgment. Olsen's Ren. Mot. for Summ. J., ECF No. 115; Boathouse's Ren. Mot. for Summ. J., ECF No. 119; Rubins' Ren. Mot. for Summ. J., ECF No. 121.

---

[2] The Rubins address the validity of Plaintiff's copyright in a Memorandum in Support of their Renewed Motion for Summary Judgment. ECF No. 122. However, rather than contest the validity of Plaintiff's copyright, the Rubins merely argue that "because there is very little originality found in Plaintiff's Bainbridge design, its actual copyright protection is quite limited." Rubins' Mem. in Supp. of Ren. Mot. for Summ. J. 6, ECF No. 122. The Court will address the scope of Plaintiff's copyright on the Bainbridge in Part IV(B)(2) of this Opinion and Order.

### 1.   Defendants' Access to the Bainbridge Home Design

As the Fourth Circuit explained in <u>Bldg. Graphics, Inc. v. Lennar Corp.</u>:

> Access may be shown by demonstrating that the infringer had an opportunity to
> view or to copy the protected material. But this showing must establish more than
> a "mere possibility that such an opportunity could have arisen"; it must be
> "reasonably possible that the paths of the infringer and the infringed work
> crossed."

708 F.3d at 578-79 (quoting <u>Ale House Mgmt., Inc. v. Raleigh Ale House, Inc.</u>, 205 F.3d 137,

143 (4th Cir. 2000)) (citing <u>Armour v. Knowles</u>, 512 F.3d 147, 152-53 (5th Cir. 2007); <u>Art</u>

<u>Attacks Ink, LLC v. MGA Entm't Inc.</u>, 581 F.3d 1138, 1143 (9th Cir. 2009)). A plaintiff,

however, need not rely solely on an alleged infringer's direct access to the protected material.

Rather, the Fourth Circuit has held:

> A court may infer that the alleged infringer had a reasonable possibility of
> access if the author sent the copyrighted work to a third party intermediary who
> has a close relationship with the infringer. An intermediary will fall within this
> category, for example, if she supervises or works in the same department as the
> infringer or contributes creative ideas to him.

<u>Towler v. Sayles</u>, 76 F.3d 579, 583 (4th Cir. 1996) (citing <u>Moore v. Columbia Pictures Indus.,</u>

<u>Inc.</u>, 972 F.2d 939, 943-44 (8th Cir. 1992); <u>Meta-Film Associates, Inc. v. MCA, Inc.</u>, 586 F.

Supp. 1346, 1358 (C.D. Cal. 1984)).[3] "[A]t a minimum, the dealings between the intermediary

and the alleged copier must involve some overlap in subject matter to permit an inference of

access." <u>Id.</u> (citing <u>Meta-Film Associates</u>, 586 F. Supp. at 1358). This Circuit, however,

"reject[s] merely 'speculative reasoning' as a basis for proving access, <u>especially when</u>

---

[3] Under the "strikingly similar" doctrine, a plaintiff may argue that the copyrighted and alleged infringing
works are "strikingly similar," and thereby rely on that similarity as circumstantial evidence of the defendant's
access. See <u>Bouchat v. Baltimore Ravens Inc.</u>, 241 F.3d 350, 355-56 (4th Cir. 2000) (dicta). It is, however, unclear
whether the Fourth Circuit has adopted the strikingly similar doctrine. <u>Id.</u> at 355-56 (endorsing, <u>in dicta</u>, the
"strikingly similar" doctrine). <u>But see id.</u> at 364 n. 9 (King, J. dissenting) ("The majority's adoption of the
'strikingly similar' doctrine is unnecessary dicta, and should accordingly lack precedential value.").

   The Court does not need to resolve whether this Circuit has embraced the "strikingly similar" doctrine. For
reasons set forth in Part III(B)(2) of this Opinion and Order, the Court finds that the Bainbridge design and Rubin
residence are not "substantially similar," much less "strikingly similar." The Court, will forego discussion of the
"strikingly similar" doctrine in assessing each Defendant's access to the Bainbridge design.

intermediaries are involved. Reasoning that amounts to nothing more than a 'tortuous chain of hypothetical transmittals' is insufficient to infer access." Bouchat v. Baltimore Ravens, Inc., 241 F.3d 350, 354 (4th Cir. 2001) (emphasis added) (quoting Towler, 76 F.3d at 583).

          a.     The Rubins' Access to the Bainbridge Design

The Rubins acknowledge by affidavit that they: (1) toured the Bainbridge model home at 204 Blackheath; (2) received a "For Sale" brochure for the Bainbridge model home at 204 Blackheath, which features photos of the home's interior, as well as its front and rear elevations; and (3) received an unsolicited copy of Plaintiff's Places to Call Home portfolio, which contained an artist rendering of the Bainbridge's front elevation, first and second floor plans, as well as room dimensions for the first and second floors. See Rick Rubin Aff. ¶¶ 1, 6, 12, ECF No. 38-1; Jennifer Rubin Aff. ¶¶ 1, 10, ECF No. 38-2. The Court **FINDS**, based on the Rubins' tour of the Bainbridge model home and receipt of Plaintiff's promotional materials, that Plaintiff has marshaled sufficient evidence to raise a genuine issue of material fact concerning whether it is reasonably possible that the Rubins had access to the Bainbridge design by virtue of their tour of the model home at 204 Blackheath and the Bainbridge's promotional materials, though there is no showing that Defendants had any access to the actual plans submitted to Ford's Colony, James City County, or any subcontractor involved in the construction of that model home.

          b.     Boathouse Creek's Access to the Bainbridge Design

Plaintiff argues that Boathouse Creek had intermediary and direct access to the Bainbridge design. See Pl's Am. Compl. ¶¶ 29-34, ECF No. 21; Pl.'s Mem. in Opp. to Ren. Mots. for Summ. J. 21-23, ECF No. 123. For the reasons set forth in this subsection, the Court finds Plaintiff fails to raise a genuine issue of material fact concerning Boathouse Creek's access to the Bainbridge design.

### i. *Intermediary Access by Boathouse Creek*

Plaintiff argues Boathouse Creek had intermediary access to the Bainbridge design through the Rubins' tour of the model home at 204 Blackheath and the Bainbridge's promotional materials. Lisa Sawin, President of Boathouse Creek, affirms that she designed and drafted working drawings for the Rubin residence. Sawin Aff. ¶¶ 1-2, ECF No. 16-1. During his deposition, Rick Rubin also attested that he and his wife exchanged between 100 and 500 emails with Sawin concerning their custom home's design. Rick Rubin Dep. 41, 47, ECF No. 116-5. Based on that relationship and interaction, Plaintiff claims that Boathouse Creek has a reasonable possibility of access to the Bainbridge design through the Rubins. In assessing Plaintiff's claim of intermediary access, the Court is guided by the Fourth Circuit's opinions in Towler v. Sayles, 76 F.3d at 579, and Bouchat v. Baltimore Ravens, Inc., 241 F.3d at 350, in assessing Plaintiff's.[4]

In Towler, the plaintiff, Virginia Towler ("Towler"), sought to send a copy of her screenplay, "Crossed Wires," to director and screenwriter Jon Sayles ("Sayles"). 76 F.3d at 582. Towler contacted SCS Films ("SCS"), operating under the mistaken belief that SCS was associated with Sayles. Towler spoke to Tracy Strain ("Strain"), an SCS employee, who agreed to forward a copy of the screenplay to Sayles. Towler sent a copy of Crossed Wires to Strain shortly thereafter. At no time did Towler write to Sayles directly or receive any correspondence from him. Id. On appeal, Towler argued that Strain and her supervisor at SCS, Shelby Stone ("Stone"), constituted intermediaries through which Sayles' access to the screenplay could be inferred. Id. at 583.

---

[4] Plaintiff cites J.R. Lazaro Builders, Inc. v. R.E. Ripberger Builders, Inc., 883 F. Supp. 336, 338 (S.D. Ind. 1995), in support of its intermediary access argument with respect to Boathouse Creek and the Olsens, see Pl.'s Mem. in Opp. to Ren. Mots. for Summ. J. 22, ECF No. 123. In J.R. Lazaro, the district court stated that "[a]ccess can . . . be proven by showing that a third person with creative input for Defendant has had access to the copyrighted work." 883 F. Supp. at 342 (citing Nimmer on Copyright § 13.02[C], at 13-27). It is apparent from the opinions in Towler, 76 F.3d at 579, and Bouchat, 241 F.3d at 350, that the Fourth Circuit has developed a more stringent standard to assess intermediary access. The Court, therefore, respectfully declines to rely upon J.R. Lazaro in assessing Defendants' access to the Bainbridge design.

The Fourth Circuit disagreed and affirmed the district court's grant of judgment as a matter of law based on Towler's failure to present evidence upon which a jury could infer that Sayles had intermediary access to Crossed Wires. The Circuit Court noted that, at that stage of the proceedings, it had to "credit Towler's testimony that Strain said she would forward 'Crossed Wires' to Sayles." Id. at 582-83. Nonetheless, the Circuit found proof of intermediary access wanting where there was no evidence that: (1) Strain actually sent a copy of Crossed Wires to Sayles; or (2) Sayles actually received a copy of Crossed Wires. That evidentiary gap was enlarged "by Sayles' testimony . . . that he never received 'Crossed Wires' from Strain," and Towler's failure to present evidence that Sayles' testimony was untruthful. Therefore, the Fourth Circuit found that Towler failed to present evidence upon which a jury could infer Sayles' intermediary access to the copyrighted screenplay. Id. at 583; see also id. (further finding Towler's speculative reasoning unpersuasive because there was "no evidence that either [Strain or Stone] . . . or SCS generally, had any contact with Sayles during the period he was working on" the alleged infringing work).

In Bouchat, on the other hand, amateur artist Frederick E. Bouchat ("Bouchat") created a team logo upon learning that Baltimore's new football team would be called the Ravens. 241 F.3d at 352. Bouchat then met with John Moag ("Moag"), Chairman of the Maryland Stadium Authority, who offered to pass Bouchat's drawings along to the Ravens leadership for consideration. On April 1 or 2, 2006, Bouchat faxed his drawings to Moag at the Maryland Stadium Authority. Bouchat received a fax confirmation, but did not retain the printed confirmation receipt. Id. at 353. Moag shared an office with David Modell ("Modell"), the Ravens' team owner. Id. at 354. On April 2, 2006, Modell met with a representative from the NFL design team to discuss the Ravens' logo. In June 1996, the Ravens unveiled their new logo,

23

which was substantially similar to one of the drawings Bouchat had faxed to Moag. Id. at 353. The case was tried before a jury and a verdict was returned in Bouchat's favor. Id. at 352. On appeal, the defendants argued that Bouchat's proof of intermediary access amounted only to a legally insufficient "tortuous chain of hypothetical transmittal." The Fourth Circuit disagreed, finding that Bouchat had sufficiently proven intermediary access by producing evidence that: (1) the logo was transmitted to Moag; and (2) Moag had a close relationship with Modell, by virtue of their sharing a common office. Id. at 354.

The intermediaries in Towler and Bouchat actually received copies of the protected works, yet the Fourth Circuit reached a different result concerning the issue of access in each case. What distinguishes those cases is the alleged infringer's access to the copies received by the intermediary. In Towler, Strain and Sayles did not maintain a relationship that would enable Sayles to easily access Strain's copy of Crossed Wires, and Towler failed to produce evidence that Strain actually transmitted a copy to Sayles. Towler, 76 F.3d at 583. In Bouchat, on the other hand, the jury could infer Modell's access, notwithstanding the plaintiff's failure to produce evidence that Moag actually transmitted the logo to Modell, because Moag and Modell maintained a relationship that would enable Modell to easily access the faxed copies of the plaintiff's logo—i.e., they shared common office space.

The Rubins' relationship with Boathouse Creek, in the Court's view, is analogous to the facts of Towler. The Rubins and Boathouse Creek maintained a closer relationship than that in Towler, having exchanged between 100 and 500 emails concerning the design of the Rubins residence. But, that relationship falls far short of Bouchat, as Boathouse Creek could not access the Bainbridge design absent the Rubins' affirmative transmittal of the information and materials in their possession to Sawin, Boathouse Creek's President. Plaintiff, therefore, must advance

24

some modicum of evidence that the Rubins actually transmitted the Bainbridge design to Boathouse Creek.[5]

In affirming the district court's grant of judgment as a matter of law, the Fourth Circuit in Towler emphasized that the plaintiff's case suffered from a gap in proof:

> Towler introduced no evidence that Strain actually sent 'Crossed Wires' to Sayles. Nor has Towler introduced evidence from which a jury could draw a reasonable inference that Sayles received 'Crossed Wires.' This gap in proof is enlarged by Sayles' testimony . . . that he never received 'Crossed Wires' from Strain. Towler has presented no evidence upon which a jury could base an inference that Sayles was not truthful.

Towler, 76 F.3d at 583 (citing Ferguson v. National Broadcasting Co., Inc., 584 F.2d 111, 113 (5th Cir. 1978)); see also Bouchat, 241 F.3d at 354 (stating that Towler found inadequate proof of access because "[t]here was no evidence that the agents had sent the work to the defendant, only the plaintiff's suggestion that such a transmittal was hypothetically possible.").

Plaintiff relies on the same sort of speculative allegations the Fourth Circuit found unpersuasive in Towler in alleging Boathouse Creek's intermediary access to the Bainbridge design. As with Towler, Plaintiff fails to produce any evidence that the Rubins sent, or that Boathouse Creek received, information concerning Plaintiff's Bainbridge design. Also as in Towler, the gap in proof is enlarged by affidavits submitted by the Rubins and Sawin, as well as

---

[5] Plaintiff recently complained of the discovery permitted in this matter. However, as set forth in the Order filed on September 26, 2013, "Plaintiff has not been diligent pursuing discovery since remand, having failed to file a Rule 56(d) Affidavit or any discovery motion since the last of the Renewed Motions for Summary Judgment was filed on December 21, 2012." Op. & Ord. ECF No. 18, ECF No. 141 (referencing Fed. R. Civ. P. 56(d)). The Court further found in that Opinion and Order that "Plaintiff's previously-filed Rule 56(d) Affidavit, as well as its Opposition Memorandum to the Renewed Motions for Summary Judgment, are not adequate substitutes for a post-remand Rule 56(d) Affidavit." Op. & Ord. 18, ECF No. 141. Thus, the Court explained that "[i]nsofar as Plaintiff desired additional discovery, it should have timely filed a Rule 56(d) Affidavit or, at least, filed a motion for additional discovery with the Court." Op. & Ord. 21, ECF No. 141.

The Court, therefore, has little sympathy for Plaintiff insofar as it may argue that it was not afforded adequate discovery to establish transmittal between the Rubins and Boathouse Creek. Insofar as Plaintiff desired additional discovery, it should have timely filed a Rule 56(d) Affidavit or, at least, filed a motion for additional discovery with the Court. Over the last nine months Plaintiff has done neither. As explained in its September 26, 2013 Opinion and Order, "[t]he Court will not allow Plaintiff to further delay a ruling on" the Renewed Motions for Summary Judgment based on its failure to comply with the Federal Rules or diligently pursue discovery.

testimony offered by Rick Rubin and Sawin at their depositions. Plaintiff has presented no evidence upon which a jury could infer that the Rubins or Sawin were untruthful.

The Court's finding that Plaintiff has failed to marshal sufficient evidence to support an inference that Boathouse Creek accessed the Bainbridge through the Rubins is bolstered by affidavits and depositions. See Towler, 76 F.3d at 583 (stating that the gap in proof of intermediary access was enlarged by alleged infringer's testimony that he never received the copyrighted work from the intermediary, and the plaintiff never introduced evidence upon which a jury could base an inference that the alleged infringer was untruthful). The Rubins each affirm that they: (1) never provided Boathouse Creek with Plaintiff's copyrighted work or any other material from Plaintiff; and (2) never instructed Boathouse Creek to design a home based Plaintiff's copyrighted work. See Rick Rubin Aff. ¶¶ 13-14, ECF No. 38-1; Jennifer Rubin Aff. ¶¶ 11-12, ECF No. 38-2. Likewise, Lisa Sawin affirms that: (1) the Rubins never requested Boathouse Creek to create plans or construct a home based on Plaintiff's copyrighted work; and (2) Boathouse Creek never viewed or possessed plans for the copyrighted work prior to the filing of Plaintiff's Complaint. Sawin Aff. ¶¶ 4-6, ECF No. 116-6. The depositions of Rick Rubin and Lisa Sawin are consistent with these affidavits, and the Plaintiff has not presented evidence upon which a jury could base an inference that any of these statements are untruthful.

Having only alleged the "mere possibility of access," the Court **FINDS** that Plaintiff fails to marshal sufficient evidence to support a finding that there exists a reasonable possibility Boathouse Creek had intermediary access to the Bainbridge through the Rubins. See Bldg. Graphics, 708 F.3d at 580 (affirming district court's grant of summary judgment based on finding that plaintiff had only alleged the "mere possibility of access" where plaintiff failed to

marshal sufficient evidence that there existed a reasonable possibility of defendant's access to the copyrighted plans).

Plaintiff further argues that the Court should forego ruling on Boathouse Creek's access to the Bainbridge at this stage of the proceedings based on paragraph three of Lisa Sawin's Affidavit, which states: "At no time prior to the filing of plaintiff's Complaint do I recall seeing or discussing with the Rubins a copy of Charles Ross Homes' portfolio, Places to Call Home, and study plan." Sawin Aff. ¶ 3, ECF No. 16-1 (emphasis added). Plaintiff insists it is entitled to additional discovery based on Sawin's use of the word "recall," which Plaintiff characterizes as a self-serving denial. Pl.'s Mem. in Opp. to Ren. Mots. for Summ. J. 8, ECF No. 123.

The Court finds Plaintiff's argument unpersuasive. First, the definite statements set forth in paragraphs four to seven of Sawin's Affidavit resolve any qualification in paragraph three. Sawin Aff. ¶¶ 4-7, ECF No. 16-1. Moreover, Sawin addressed this in a more definite manner at her deposition. During the course of the deposition, Plaintiff's counsel asked Sawin if the Rubins had brought any flyers to their initial design meeting, to which Sawin replied: "I know not to look at other designers' work. So I can say with certainty I didn't look at something—if they tried to show me, I would have said, 'I can't look at it.'" Sawin Dep. 15, ECF No. 116-8 (emphasis added).

Second, the Court has provided Plaintiff ample opportunity to perform discovery on this issue. Sawin's Affidavit was originally filed on November 16, 2010, Sawin Aff., ECF No. 16-1, as an attachment to Boathouse Creek's Motion for Summary Judgment, ECF No. 16, concerning Plaintiff's Original Complaint, ECF No. 1. After amending its Complaint, Pl.'s Am. Compl., ECF No. 21, and Boathouse Creek filing its Original Motion for Summary Judgment, ECF No. 44, Plaintiff filed a Memorandum in Opposition to all of the Defendants' Original Motions for

Summary Judgment on February 21, 2011, ECF No. 52. In its Opposition Memorandum, Plaintiff requested that the Court defer consideration of the Original Motions for Summary Judgment and provide it an opportunity to perform discovery pursuant to Rule 56(d) of the Federal Rules of Civil Procedure. Pl.'s Opp. Mem. 4, ECF No. 52; see also Burns' Aff. 4, ECF No. 52-1 (stating that "[a]t a minimum, the depositions of Lisa Moberg [a/k/a Sawin], Rick Rubin, and Beverly Olsen are required").

On August 9, 2011, the Court held a hearing concerning Megan E. Burns' ("Burns")[6] Affidavit seeking discovery pursuant to Rule 56(d). See Min. Entry, ECF No. 62. At that hearing, the Court granted Plaintiff's request to take the depositions of Rick Rubin and Lisa Sawin.[7] The Court explained that it was inclined "to allow the deposition of Ms. Moberg [a/k/a Sawin] because she said she couldn't recall." Hrg. Tr. 23, Aug. 9, 2011, ECF No. 116-1. Thus, the Court permitted Plaintiff to take Sawin's deposition for the express purpose of resolving any doubt that arose as a result of Sawin's use of the word "recall" in her Affidavit.

Plaintiff deposed Sawin on September 1, 2011. Sawin Dep., ECF No. 116-8. Rather than Burns, who argued the point before the Court, Plaintiff was represented at that deposition by John C. Lynch ("Lynch"), also of the firm Troutman & Sanders. During the course of that deposition, Lynch never mentions the Places to Call Home portfolio by name. He does, however, question Sawin concerning about an "Exhibit 2," which appears to reference Plaintiff's portfolio.[8] Lynch asks "[h]ave you ever seen this exhibit before?" Sawin unequivocally replies

---

[6] Megan E. Burns, of Troutman & Sanders, is one of Plaintiff's counsel in this matter.
[7] Since remand, the Court has further permitted Plaintiff to depose Beverly Olsen, owner of Olsen Find Homes, concerning her access to the Bainbridge design. See Olsen Dep., ECF No. 134-1.
[8] Sawin's deposition was taken on September 1, 2011. Unfortunately, Plaintiff has never filed a copy of Sawin's deposition transcript with the Court for its review. The Olsens furnished a copy of Sawin's Deposition, ECF No. 116-8, as an attachment to the Memorandum in Support, ECF No. 116, of their Renewed Motion for Summary Judgment, ECF No. 115. That copy does not, however, provide any information concerning the exhbits referenced therein. Thus, the Court cannot be sure whether "Exhibit 2" references Plaintiff's Places to Call Home portfolio.

"[n]o." Sawin Dep. 52:6-52:19, ECF No. 116-8. Plaintiff has never challenged the veracity of Sawin's denial.

The Court has provided Plaintiff an opportunity to depose Sawin on her use of the word "recall" in her Affidavit. Insofar as "Exhibit 2" refers the <u>Places to Call Home</u> portfolio, no further delay is warranted, as Sawin's deposition resolves any qualification set forth in her Affidavit. Insofar as "Exhibit 2" does not refer to the <u>Places to Call Home</u> portfolio, this would mean that Plaintiff's counsel failed to question Sawin on the very topic the deposition sought to resolve, and only inquired as to Sawin's access to the copyrighted work in a very generalized and qualified way. Even then, however, Sawin stated unequivocally that she had never discussed the Bainbridge design with the Rubins or Olsen prior to the filing of this suit. Sawin Dep. 22::22-23:20 (stating that neither the Bainbridge design nor model home at 204 Blackheath had ever arisen in her face-to-face meetings).

Plaintiff's counsel chose not to refer to the <u>Places to Call Home</u> portfolio by name during the course of Sawin's deposition. Regardless of counsel's motivation for questioning Sawin in that matter, the Court is satisfied that Plaintiff has had ample opportunity to address any equivocation in Sawin's Affidavit, and will not further delay these proceedings or permit Plaintiff's counsel to manufacture a genuine issue of material fact based on their failure to properly depose a witness or file a complete copy of Sawin's deposition with the Court. <u>See also</u> Ord., Sept. 26, 2013, 2013, ECF No. 141 (finding that Plaintiff is not entitled to further discovery because, since remand, Plaintiff has failed to: (1) comply with Rule 56(d) of the Federal Rules of Civil Procedure; and (2) diligently pursue discovery).

### ii. *Direct Access by Boathouse Creek*

Plaintiff also alleges that Boathouse Creek had direct access to the Bainbridge design through: (1) photos and information concerning the Bainbridge model home at 204 Blackheath

posted on various Relator websites, one of which included a study plan of each level of the home; (2) the Bainbridge model home at 204 Blackheath's placement on a corner lot, which rendered the front, right side, and rear elevations subject to photography from the street; and (3) filings of the Bainbridge plan with the James City County Code Compliance office and the Ford Colony's Environmental Control Committee ("ECC"). See Pl.'s Am. Compl. ¶¶ 17-27, ECF No. 21. Plaintiff does not, however, go so far as to allege that Boathouse Creek actually accessed the Bainbridge through any of these means.

As the district court explained in Building Graphics, Inc. v. Lennar Corp., "[p]ublic dissemination of a work 'merely creates the possibility of access,' and courts have consistently held that the fact that a defendant 'could have' or 'might have' engaged in alleged conduct, without any substantive evidence, amounts to 'mere speculation'" and is insufficient to establish access. 866 F. Supp. 2d 530, 541 (W.D.N.C. 2011), aff'd, Bldg. Graphics, 708 F.3d at 573 (citing Bell v. E. Davis Int'l, Inc., 197 F. Supp. 2d 449, 461–62 (W.D.N.C. 2002) (J. Thornburg)).

Plaintiff's allegations that Boathouse Creek accessed the Bainbridge design via Relator websites, the model home's placement on a corner lot, and public records amounts to mere speculation. Plaintiff allegations raise the "mere possibility of access," and there is absolutely no evidence from which a jury could infer a "reasonable possibility" of Boathouse Creek's direct access to the Bainbridge through these means. That gap in proof is enlarged by Sawin's Affidavit, in which she affirms to have never accessed the Bainbridge by the aforementioned means. Plaintiff has given the Court no reason to doubt the truthfulness of Sawin's representations. Cf. Towler, 76 F.3d at 583 (stating gap in proof of intermediary access was

enlarged by alleged infringer's testimony, and plaintiff never introduced evidence to doubt truth of that testimony).

        c.    <u>Olsen Fine Homes and Beverly Olsen's Access to the Bainbridge Design</u>

Plaintiff argues that the Olsens had intermediary and direct access to the Bainbridge design. For reasons set forth in this subsection, the Court **FINDS** that Plaintiff's allegations fail to raise a genuine issue of material fact concerning whether it is reasonably possible the Olsens had access to the Bainbridge design.

        i.    *Intermediary Access by the Olsens*

Plaintiff argues that the Olsens had access to the Bainbridge design through the Rubins. Applying the standard developed in Part III(B)(1)(b)(i) of this Opinion and Order, the Court **FINDS** that Plaintiff fails to marshal sufficient evidence that there exists a reasonable possibility that the Olsens had intermediary access to the Bainbridge design.

First, to maintain that an alleged infringer had a reasonable possibility of intermediary access to a copyrighted work, a plaintiff must establish that the alleged infringer and intermediary maintained a "close relationship" and that their dealings involved some overlap in subject matter. See <u>Towler</u>, 76 F.3d at 583. A close relationship may, for example, be found where the: (1) intermediary supervises the alleged infringer; (2) intermediary and alleged infringer are employed in the same department; (3) intermediary and alleged infringer share office space; or (4) intermediary and alleged infringer exchange creative ideas. See <u>Bouchat</u>, 241 F.3d at 354 (referencing shared office space); <u>Towler</u>, 76 F.3d at 583 (referencing supervision, employment in a common department, and the exchange of creative ideas).

By Plaintiff's own admission, the Olsens were only involved in the construction of the Rubin residence based on plans prepared by Boathouse Creek. Pl.'s Am. Compl. ¶ 28, ECF No. 21 ("In 2010, Charles Ross discovered that <u>Olsen FHB [the Olsens] had been engaged to</u>

construct a home for the Rubins using plans (the "Infringing Plans") prepared by BC Graphics [Boathouse Creek] . . . ." (emphasis added)). This is not the sort of "close relationship" on which a claim of intermediary access may be based.

In reaching that conclusion, the Court is guided by the employment examples offered in Towler. The Fourth Circuit did not suggest that a close relationship may be premised merely on common employment. Rather, the Towler opinion offers examples that evidence a more intimate association between the intermediary and alleged infringer. 76 F.3d at 583 (referencing supervision and employment in a common department). The relationship between the Rubins and Olsens—i.e., the relationship between a homeowner and general contractor—does not evidence such intimacy. Their relationship was purely contractual. Nor does home construction, based on plans supplied by a third party, require a general contractor to exchange creative ideas with a homeowner. See Pl.'s Am. Compl. ¶ 28, ECF No. 21 (alleging that the Olsens merely constructed the Rubins' residence based on plans supplied by Boathouse Creek). Therefore, the Court **FINDS** that Plaintiff fails to allege that the Rubins and Olsens maintained the sort of relationship that might support a finding of intermediary access.

Second, Plaintiff fails to produce evidence that the Rubins actually transmitted the Bainbridge design to the Olsens. The Olsens deny accessing the Bainbridge design prior to Plaintiff filing its Original Complaint. Olsen's Mem. in Supp. of Ren. Mot. for Summ. J. 2-9, ECF No. 116. Plaintiff insists, however, that the Olsens' denial of intermediary access "is cast into doubt given that the Rubins accessed the Bainbridge, received a copy of Places to Call Home, and had input into the design of their home." Pl.'s Mem. in Opp. to Ren. Mots. for Summ. J. 13, 21-22, ECF No. 123. Plaintiff, therefore, does not allege that the Rubins actually transmitted the Bainbridge design to the Olsens. Nor does Plaintiff allege that the Olsens

32

actually received a copy of the Bainbridge design. Rather, Plaintiff seeks to establish intermediary access by alleging that the Rubins may have, or could have, transmitted the Bainbridge design to the Olsens. As explained in Part IV(B)(1)(b)(i) of this Opinion and Order, speculative allegations that a party "may have" or "could have" accessed a copyrighted work through an intermediary will not suffice to establish the requisite "reasonable possibility" of access.

Therefore, the Court **FINDS** that Plaintiff's allegation of intermediary access by the Olsens fails as a matter of law because: (1) Plaintiff fails to allege that the Rubins and Olsens maintained a "close relationship" which could support a finding of intermediary access; and (2) Plaintiff fails to marshal sufficient evidence to support a finding that there exists a reasonable possibility Boathouse Creek had access to the Bainbridge through the Rubins. See Bldg. Graphics, 708 F.3d at 580 (affirming district court's grant of summary judgment where plaintiff failed to marshal sufficient evidence that there existed a reasonable possibility of defendant's access to the copyrighted plans).

ii. *Direct Access by the Olsens*

As with Boathouse Creek, Plaintiff's Amended Complaint alleges that the Olsens had access to the Bainbridge design through: (1) Realtor website listings; (2) the Bainbridge model home at 204 Blackheath's placement on a corner lot; and (3) filings of the Bainbridge plan with the James City County Code Compliance office and the Ford Colony's ECC. See Pl.'s Am. Compl. ¶¶ 17-27, ECF No. 21. Plaintiff, however, fails to offer any evidence that the Olsens actually accessed the Bainbridge by these means. Pursuant to the standard set forth at Part III(B)(1)(c)(ii) of this Opinion and Order, these allegations amount to mere speculation. Therefore, the Court **FINDS** that Plaintiff's allegations raise the "mere possibility of access,"

33

and there is absolutely no evidence from which a jury could infer a "reasonable possibility" of access.

Plaintiff also argues Olsen's direct access to the Bainbridge based on portions of Sawin's and Olsen's deposition. During the course of Sawin's deposition, Plaintiff asked "[h]as the words "Charles Ross" ever been referred to in any . . . emails" that Sawin exchanged with Olsen. Sawin Dep. 24, ECF No. 116-8. In response, Sawin explained that in March 2010, during the construction phase—i.e., after the design for the Rubin residence had been completed—Olsen raised concerns about the cost of producing the oversized sheets on which Sawin was supplying her plans. During their email exchange, Sawin suggested that the plans would not fit on the smaller size sheets, but Olsen replied that "[s]he had seen a plan of Charles Ross . . . . where it would work." Sawin Dep. 24, ECF No. 116-8. Sawin, however, further stated that the Bainbridge had never been mentioned in any email. Sawin Dep. 25, ECF No. 116-8.

Based on Sawin's comments, the Court permitted Plaintiff to depose Beverly Olsen concerning her direct access to the Bainbridge design. Plaintiff took Beverly Olsen's deposition on June 11, 2013 and filed a Notice of Filing of Deposition Transcript on June 21, 2013. Olsen Dep., ECF No. 134-1. During her deposition, Olsen stated that, in the early part of 2010, she received Sawin's plans for the Rubin residence. Olsen Dep. 10:22-11:10, ECF No. 134-1. The plans were on 36 x 42 inch paper, at a scale of 1/4 inch per square foot. Olsen Dep. 11:20-12:5, ECF No. 134-1. Olsen felt that this size was unusual, unwieldy, and costly, and explained that she had always submitted 24 x 36 inch plans to building department for James City County. Olsen Dep. 12:21-13:11, ECF No. 134-1. At some point, Olsen emailed Sawin in an effort to obtain the plans on a smaller sheet. Olsen Dep. 14:11-14:18, ECF No. 134-1. In reply, Sawin stated that the plan for the Rubin residence would not fit on a 24 x 36 inch sheet because, at a 1/4

34

inch scale, the footprint of the house and garage were too large. Olsen responded that she had seen a Charles Ross plan where it "worked," in the sense the plan placed the home on one sheet and the detached garage on another sheet. Olsen Dep. 14:19-15:9, ECF No. 134-1. Olsen does not recall which plan she saw or where it was seen, but explained that the only place this viewing would have occurred was the Ford's Colony Environmental Control Committee ("ECC") office during the early part of 2010.

Olsen further stated that, insofar as she viewed any plan produced by Plaintiff, it would have been a cursory viewing for the purpose of looking at the scale of the drawing. Olsen Dep. 15:20-15:23, ECF No. 134-1. Moreover, during her deposition, Olsen testified that she had not discussed the plan that she had seen with the Rubins or Sawin, nor did she sketch or photograph that plan, or take notes concerning the plan. Olsen Dep. 18:3-18:8, ECF No. 134-1. Finally, Olsen testified that the design of the Rubin residence had been completed in March 2010, during the construction phase when she would have viewed one of Plaintiff's plans. Olsen Dep. 19:24-20:13, ECF No. 134-1. After viewing the plans, Olsen "did not make any changes[,] nor recommend any changes" to the Rubin residence's design. Olsen Dep. 20:8-20:13, ECF No. 134-1.

As the Fourth Circuit has recently explained, to rely successfully on circumstantial evidence of copyright infringement, a plaintiff must show more than a "mere possibility" of a defendant's access to the copyrighted work. Rather, "it must be 'reasonably possible the paths of the infringer and the infringed work crossed.'" Bldg. Graphics, Inc., 708 F.3d at 578 (quoting Ale House Mgmt., 205 F.3d at 143) (citing Armour, 512 F.3d at 152–53; Art Attacks Ink, LLC, 581 F.3d at 1143). By Olsen's deposition, Plaintiff has raised the "mere possibility," rather than a reasonable possibility, that the design plan viewed by Olsen was the Bainbridge—i.e., the

copyrighted work involved in this case.  Therefore, the Court **FINDS** that that Olsen's deposition raises the "mere possibility of access" after the design for the Rubin residence had been completed, and there is absolutely no evidence from which a jury could infer a "reasonable possibility" of access from her deposition testimony.

   2.    **Substantial Similarity Between Plaintiff's Bainbridge Design and the Rubin Residence**

   To present a valid claim of copyright infringement based on circumstantial evidence, a plaintiff must adequately allege that the copyrighted and alleged infringing works are "substantially similar."  Substantial similarity is a two-pronged test.  "[T]o prove substantial similarity, a plaintiff must show that the works are (1) 'extrinsically similar because they contain substantially similar ideas that are subject to copyright protection,' and (2) 'intrinsically similar in the sense that they express those ideas in a substantially similar manner from the perspective of the intended audience of the work.'"  Charles W. Ross Builder, Inc. v. Olsen Fine Home Bldg., LLC, 496 Fed. Appx. 314, 318 (4th Cir. 2012) (unpublished decision) (quoting Universal Furniture, 618 F.3d at 417) (citing Dawson v. Hinshaw Music Inc., 905 F.2d 731, 732–33 (4th Cir. 1990)).

   Extrinsic similarity "is an objective inquiry, which requires consideration of 'external criteria of substantial similarities in both ideas and expression.'"  Id. (quoting Universal Furniture, 618 F.3d at 435-36).  In conducting its extrinsic inquiry, "a court must consider whether the two works 'contain substantially similar ideas that are subject to copyright protection.'"  Id. (quoting Lyons, 243 F.3d at 801).  Expert testimony may be helpful to a court's determination of extrinsic similarity.  Id. (citing Universal Furniture, 618 F.3d at 435-36; Towler, 76 F.3d at 583).

36

"By contrast, intrinsic similarity is a subjective inquiry, which requires consideration of 'the total concept and feel of the works, but only as seen through the eyes of the . . . intended audience of the plaintiff's work.'" Id. (internal citation omitted) (quoting Universal Furniture, 618 F.3d at 436) (citing Towler, 76 F.3d at 583-84). "[T]he intrinsic similarity test asks whether 'the ordinary observer, unless he set out to detect the disparities, would be disposed to overlook them, and regard their aesthetic appeal as the same.'" Id. at 318-19 (quoting Universal Furniture, 618 F.3d at 436). The intrinsic similarity inquiry "generally does not require the aid of expert testimony." Charles W. Ross, 496 Fed. Appx. at 319 (citing Towler, 76 F.3d at 583-84).

In conducting its intrinsic inquiry, the Fourth Circuit has held that "a court should be hesitant to find that the lay public does not fairly represent a work's intended audience." Dawson, 905 F.2d at 737. Departure from a lay-public standard is only appropriate where the intended audience has "specialized expertise," which "must go beyond mere differences in taste and instead must rise to the level of the possession of knowledge that the lay public lacks." Id.

    a.   Extrinsic Similarity

In conducting its extrinsic similarity inquiry, "a court must consider whether the two works 'contain substantially similar <u>ideas that are subject to copyright protection</u>.'" Charles W. Ross, 496 Fed. Appx. at 318 (emphasis added) (quoting Lyons, 243 F.3d at 801). Since only "ideas that are subject to copyright protection" should be considered, the Court must first determine the extent and scope of copyright protection for the Bainbridge design.[9] Once the

---

[9] See Charles W. Ross, 496 Fed. Appx. at 321 n.5 ("[I]n view of our holding, we need not consider Charles Ross' argument that the district court erred in concluding that the Bainbridge model was entitled to only a lesser, 'thin' degree of copyright protection because the design was constrained by the elements of Georgian architecture, and by the requirements of the Ford's Colony Purchaser's Handbook. These factors should be considered by the district court in the first instance within the framework of this Court's two-part test for determining substantial similarity."); see also Trek Leasing, Inc. v. United States, 66 Fed. Cl. 8, 12 (Fed. Cl. 2005) ("Once the protectable aspects of the plaintiff's work are identified, they may be compared with the allegedly infringing work to determine copyright liability.").

protectable elements of the Bainbridge are identified, the Court can then assess whether they are substantially similar to the ideas contained in the Rubin residence's design.

> i.    *Extent and Scope of Copyright Protection for Plaintiff's Bainbridge Design*

Copyright protection extends to "original works of authorship fixed in any tangible medium of expression . . . ." Copyright Act, 17 U.S.C. §§ 101-122 (2011). The Copyright Act was amended in 1990 to include the Architectural Works Copyright Protection Act ("AWCPA"), which extends protection to any "architectural work," defined as "the design of a building as embodied in any tangible medium of expression, including a building, architectural plans, or drawings." 17 U.S.C. § 101; 17 U.S.C. § 102(a)(8). An "architectural work" includes "the overall form as well as the arrangement and composition of spaces and elements in the design, but does not include individual standard features." 17 U.S.C. § 101.

The legislative history suggests that, by extending the Copyright Act's protections to the "arrangement and composition of spaces and elements," Congress sought to recognize that "creativity in architecture frequently takes the form of a selection, coordination, or arrangement of unprotectible elements into an original, protectible whole." H.R. Rep. No. 101-735 (1990), reprinted in 1990 U.S.C.C.A.N. 6935, 6949. By its own terms, however, the Act does not protect "individual standard features." 17 U.S.C. § 101 (excluding "individual standard features" from the definition of "architectural work"). Examples of individual standard features include "common windows, doors, or other staple building components." H.R. Rep. No. 101-735 (1990), reprinted in 1990 U.S.C.C.A.N. 6935, 6949. "A grant of exclusive rights in such features would impede, rather than promote, the progress of architectural innovation," though that exception is not "intended to exclude . . . any individual features that reflect to architect's creativity." H.R. Rep. No. 101-735 (1990), reprinted in 1990 U.S.C.C.A.N. 6935, 6949. The

Act also does not protect "standard configurations of spaces," 37 C.F.R. § 202.11(d)(2), or design elements that are functionally required, H.R. Rep. No. 101-735 (1990), reprinted in 1990 U.S.C.C.A.N. 6935, 6951-52 ("Protection would be denied for functionally determined elements . . . .").

Congress did not intend, by its effort to define what is and is not protected in the definition of "architectural work," to suggest that a different standard of originality or similarity applies in the architectural context.   See H.R. Rep. No. 101-735 (1990), reprinted in 1990 U.S.C.C.A.N. 6935, 6952 (stating purpose for definitional elements of "architectural work"). Rather, Congress sought to "give the courts some guidance regarding the nature of . . . protected matter" under the AWCPA.  H.R. Rep. No. 101-735 (1990), reprinted in 1990 U.S.C.C.A.N. 6935, 6952.  To that end, "[t]he proper scope of protection for architectural works is distinct from registrability," and the scope of copyright protection is ultimately "to be made on an ad hoc basis" by the courts.  H.R. Rep. No. 101-735 (1990), reprinted in 1990 U.S.C.C.A.N. 6935, 6952; see also Feist Publications, Inc. v. Rural Tel. Serv. Co., Inc., 499 U.S. 340, 348 (1991) ("The mere fact that a work is copyrighted does not mean that every element of the work may be protected.").

It appears that Congress sought, in adopting the AWCPA, to protect only those "features [of architectural works] that reflect the architect's creativity," while excluding from the Copyright Act any unoriginal features, the protection of which "would impede, rather than promote, the progress of architectural innovation." H.R. Rep. No. 101-735 (1990), reprinted in 1990 U.S.C.C.A.N. 6935, 6952.  As an architectural work, Plaintiff's Bainbridge design is no doubt entitled to some measure of copyright protection.  But, that measure of protection is very limited for three distinct, but related reasons.

First, a number of the similarities alleged in Plaintiff's Amended Complaint pertain to "individual standard features" undeserving of protection under the Copyright Act because "[a] grant of exclusive rights in such features would impede, rather than promote, the progress of architectural innovation." H.R. Rep. No. 101-735 (1990), reprinted in 1990 U.S.C.C.A.N. 6935, 6949 (providing non-exhaustive list of "individual standard features," including "common windows, doors, or other staple building components"); see 17 U.S.C. § 101 (exempting "individual standard features" from the term "architectural work").

Amongst those design elements on the Bainbridge which constitute non-protectable, individual standard features are the: (1) inclusion of a basement foundation and "walk out" porch, which the Court has reviewed and finds to be nothing more than a standard concrete patio running the length of the main home's rear elevation, Pl.'s Am. Compl. ¶¶ 35B, 35K, ECF No. 21; (2) use of common 10-foot ceilings in the basement and first levels, and 9-foot ceilings on the second level, Pl.'s Am. Compl. ¶ 35C, ECF No. 21; (3) inclusion of a three-car garage in a courtyard configuration, Pl.'s Am. Compl. ¶ 35E, ECF No. 21; (4) the use of a covered breezeway and a "masonry walking surface"—i.e., a sidewalk—to connect the house and garage, Pl.'s Am. Compl. ¶ 35F, ECF No. 21; (5) use of architectural shingles on roofing surfaces, Pl.'s Am. Compl. ¶¶ 35G, 35N ECF No. 21; (6) use of boxed eave returns on the gable ends of a home and garage, Pl.'s Am. Compl. ¶ 35G, ECF No. 21; (7) use of a "low-pitched roof" on portions of a rear elevation, Pl.'s Am. Compl. ¶ 35H, ECF No. 21; (8) use of French Doors to allow for ingress and egress from the interior's first floor to the "Veranda"—i.e., a roofed porch, Pl.'s Am. Compl. ¶ 35I, ECF No. 21; (9) inclusion of a first floor Master Suite with boxed bay sitting area, Pl.'s Am. Compl. ¶¶ 35K-L, 35CC, ECF No. 21; (10) inclusion of commonly-sized windows and doors, Pl.'s Am. Compl. ¶ 35P, ECF No. 21; (11) use of a shed-type roof on a box

40

bay, Pl.'s Am. Compl. ¶ 35N, ECF No. 21; (12) use of the terms "Dining Room," "Foyer," "Library," "Kitchen," "Master Bedroom," "Master Bath," "Half Bath," and "Garage" to describe various rooms, which are so common as to be industry standard, Pl.'s Am. Compl. ¶¶ 35R-35S, ECF No. 21; (13) inclusion of a roughed-in future bath and storage areas in the basement, Pl.'s Am. Compl. ¶ 35T, ECF No. 21; (14) use of a tray ceiling, as well as the inclusion of a "niche" for the storage of china and flatware, in the dining room, Pl.'s Am. Compl. ¶ 35V, ECF No. 21; and (15) inclusion of a first-floor bedroom with an ensuite bathroom, Pl.'s Am. Compl. ¶¶ 35DD-35EE, ECF No. 21.

Second, Plaintiff relies heavily on design elements that are beyond the Copyright Act's scope because they are either indispensable or common to Georgian-style architecture. See Trek Leasing, 66 Fed. Cl. 8 at 20-21 (the use of stone, mortar, capstones, and parapets was unprotectable under the Copyright Act because such features are very common to the BIA Pueblo Revival Style). Use of standard, Georgian-style architectural features does not render the copyrighted work unoriginal but, because it borrows heavily from the public domain, the Bainbridge is entitled to narrower copyright protection than a work composed of wholly original elements.

For instance, Plaintiff's Amended Complaint alleges that "[b]oth the Copyrighted Work and the Infringing House are Georgian architectural style" which depict "a two-story main body flanked by one-story wings." Pl.'s Am. Compl. ¶ 35A. A two-story main building flanked by one-story wings is common to nearly all Georgian-style architecture and, therefore, is neither original nor protectable. Other design elements that fall beyond the Copyright Act's scope due to their commonality in Georgian-style architecture are: (1) the center-gabled pediment type front entry porch with columns and brick steps, Pl.'s Am. Compl. ¶ 35D; and (2) the addition of

41

a "Keeping Room" off the Kitchen, which is found in many Georgian homes,[10] Pl.'s Am. Compl. ¶¶ 35J-K, ECF No. 21.

Plaintiff's reliance on Georgian-style architecture goes well beyond these limited examples. In fact, Plaintiff acknowledges as much in its <u>Places to Call Home</u> portfolio, having represented that the Bainbridge's "<u>traditional Georgian exterior</u> . . . belies a floor plan designed for modern lifestyles."[11] <u>Places to Call Home</u> 5, ECF No. 21-6 (emphasis added) (providing select pages from <u>Places to Call Home</u>, whereas the Court has been furnished with a complete copy of the portfolio). As Georgian-style homes, the exteriors of the Bainbridge and Rubin residence undoubtedly share many similarities. But, the same could be said of the Bainbridge and Carter's Grove, a prominent Virginia landmark designed and built in classic Georgian style more than two-hundred years before Plaintiff conceived of its design. In fact, if one were to cut off from Carter's Grove the portions beyond the first and second corridors at the façade of the house, the front elevation would be nearly indistinguishable from the Bainbridge's front elevation. The Court would be incredulous to learn that Plaintiff, an architecture firm located in the Williamsburg area, was unfamiliar with nearby Carter's Grove and its classical Georgian features, or the thousands of other Georgian-style homes in or around the Tidewater region.

Finally, that the Bainbridge was designed to satisfy the stringent residential restrictions which apply to all Ford's Colony properties has substantial bearing on the scope of Plaintiff's copyright. Congress only sought to afford copyright protection to design elements insofar as

---

[10] <u>See, e.g.</u> Donald A. Gardner Architects, "The Cantabria" House Plan, http://www.dongardner.com /images.aspx?pid=3499&fn=floorplans%5c11951_f.gif&f= (last visited September 25, 2013) (featuring a Keeping Room off the Kitchen); The Southern Designer, Plans DS13414-10 and DS13511-10, http://www.rickgarner.com/1over3000sqft.htm (last visited September 25, 2013) (same); e-Architectural design, Plan W81303W: Elegant Living, http://www.e-archi.com/archives/3483 (last visited September 25, 2013) (same).

[11] <u>See also</u> Cleary Decl. ¶ 27, ECF No. 123-1 (stating, as Plaintiff's Managing Director, that "[t]he design intent of 'The Bainbridge' model was to combine <u>a traditional exterior</u> with a thoughtfully-designed, open floor plan . . . ." (emphasis added)); Sobczak's First Decl. ¶ 7, ECF No. 123-2 (stating, as Plaintiff's Staff architect, the same).

they reflect the architect's creativity. An architectural design element mandated by a residential restriction does not evidence such creativity and, therefore, that element is not subject to the Copyright Act's protections. To hold otherwise would invite builders within carefully planned communities, such as Ford's Colony, to gain monopolies by securing copyright certificates for iterations of permissible home design styles. Amongst those features which are non-protectable because their inclusion is mandated by Ford's Colony include the: (1) inclusion of a side-entry garage, which is mandatory absent special circumstances, Pl.'s Am. Compl. ¶ 35E, ECF No. 21; see Purchaser's Handbook, supra, at 24; and (2) use of a brick foundation on the rear elevation's box bay, Pl.'s Am. Compl. ¶¶ 35L-M, 35CC, ECF No. 21; see Purchaser's Handbook, supra, at 22 ("All foundations exposed to view shall be brick.").

The Court finds, for the reasons set forth in this subsection, that the aforementioned design elements fall beyond the scope of the Copyright Act because they are either: (1) individual standard features; (2) common to Georgian-style architecture; or (3) mandated by the residential restrictions of Ford's Colony. The Court will, therefore, disregard these non-protectable design elements when considering the Bainbridge and Rubin residence's extrinsic similarities.

The Court cannot definitively say whether the remaining allegations of substantial similarity set forth in Plaintiff's Amended Complaint pertain to protectable design elements. However, as this matter comes before the Court upon Defendants' Renewed Motions for Summary Judgment, the Court must "view[] all facts and draw[] all reasonable inferences in the light most favorable to the" Plaintiff. See Bldg. Graphics., 708 F.3d at 578 (citing Ga. Pac. Consumer Prods., 618 F.3d at 445). Therefore, for the limited purpose of considering Defendants' Renewed Motions for Summary Judgment the Court will presume, without so

43

finding, that Plaintiff's remaining allegations of substantial similarity pertain to protectable design elements.

> ii. *Extrinsic, Substantial Similarity Between the Protectable Features of the Bainbridge Design and the Rubin Residence*

Plaintiff's remaining allegations of substantial similarity concern the coordination and arrangement of elements and spaces in the Bainbridge and Rubin residence's rear elevations, basements, and first floors. See Pl.'s Am. Compl. ¶¶ 35H, 35J, 35N–35O, 35U, 35W-35X, 35Y-35CC, 35FF. The Court finds that those allegations fail to raise a genuine issue of material fact concerning whether the Bainbridge and Rubin residence are, extrinsically speaking, substantially similar.

The Court reaches that conclusion by looking beyond Plaintiff's alleged similarities to the many differences between the two works. See Ale House, 205 F.3d at 142-44 (Fourth Circuit affirming district court's grant of summary judgment based on pleadings and finding that copyrighted and alleged infringing design plans were not "substantially similar" as a matter of law due to dissimilarities in: (1) size and proportion of seating; (2) placement of pool tables; and (3) dimensions and proportions of the bars); see also Howard v. Sterchi, 974 F.2d 1272, 1276 (11th Cir. 1992) (affirming district court's finding that defendant failed to establish substantial similarity because, "although the floor plans are visually similar and the layout is generally the same, the dissimilarities are significant" and emphasizing that because "[t]he variety of ways a two-story rectangle can be divided . . . is finite. . . . [i]n architectural plans of this type, modest dissimilarities are more significant than they may be in other types of art works."); Wickham v. Knoxville Int'l Energy Exposition, Inc., 739 F.2d 1094, 1097 (6th Cir. 1984) (finding that district court correctly concluded, on motion for summary judgment, that as a matter of law no substantial similarity existed between plaintiff's and defendants' works where substantial design

differences existed); Bldg. Graphics, Inc. v. Lennar Corp., 866 F. Supp. 2d 530, 544-45 (W.D.N.C. 2011) (discussing differences in performing substantial similarity analysis).

Lisa Sawin, by affidavit, alleges that there are a number of differences between the Bainbridge and Rubin residence. Sawin Aff., ECF No. 120-1. Boathouse Creek incorporated a partial list of those differences in its Memorandum in Support of the Renewed Motion for Summary Judgment. Boathouse's Mem. in Supp. of Ren. Summ. J. Mot. 4-11, ECF No. 120. Plaintiff objects to a number of those alleged differences in its Opposition Memorandum. Pl.'s Mem. in Opp. to Ren. Mots. for Summ. J. 10-13, ECF No. 123 (stating that "CRH disputes the following, with respect to the alleged differences between the Rubin Residence and the Bainbridge," and then providing a list that corresponds to the paragraphs in Boathouse Creek's Memorandum).

The Court has carefully reviewed the list of alleged differences and Plaintiff's objections, comparing each subparagraph to design plans and photographs of the Bainbridge and Rubin residence. As the nonmoving party, the Court resolved any disagreement or doubt concerning these alleged differences in Plaintiff's favor. This process resulted in a list, set forth in the Appendix to this Opinion and Order, of no fewer than 86 substantive differences between the Bainbridge and Rubin residence. Many of those differences pertain to the rear elevations, basements, and first floors of the Bainbridge and Rubin residence, the very areas on which Plaintiff's claims of substantial similarity rest.

The Court **FINDS**, in light of the few similarities and many differences between the Bainbridge and Rubin residence, that no reasonable juror could conclude that the two designs are, extrinsically speaking, "substantially similar." Therefore, the Court **FINDS** that Plaintiff fails to raise a genuine issue of material fact concerning whether the Bainbridge and Rubin

residence are, extrinsically speaking, "substantially similar" with respect to their protectable elements.

        b.    <u>Intrinsic Similarity</u>

Plaintiff argues that the ordinary observer of a custom-built home is the lay public. Defendants, on the other hand, argue that the ordinary observer of a custom-built home possess "specialized expertise," insofar as they are more likely to detect subtle differences between two home designs. The Court need not resolve this dispute. The Court will assume, without so finding, that the less discerning lay-person standard sought by Plaintiff applies. Even applying that standard, however, the Court **FINDS** that no reasonable juror could conclude that the Bainbridge and Rubin residence are, intrinsically speaking, "substantially similar."

The Court has carefully assessed the "total concept and feel" of the two homes based on plans and photographs submitted by the parties. There are surely similarities amongst these homes. But, of course, there are similarities amongst most modern homes. As with most modern homes, both the Bainbridge and Rubin residence have a front door, windows, and a garage. The interiors are also similar in that there are three levels divided, with the spaces designated for common purposes—e.g., a foyer, kitchen, guest bedroom, and main bedroom. In the Court's view, even a lay person would have enough sense to know that they should not find that two homes are substantially similar in "total concept and feel" based on such superficial commonalties. To hold otherwise would negate the intrinsic inquiry in the architectural context, as there would rarely be a case where the jury would not find two homes to be substantially similar in total concept and feel.

The Court, therefore, **FINDS** that even a layperson would have enough sense, when asked to assess the "total concept and feel" of two homes, to look beyond those superficial commonalities to: (1) choices amongst design elements; and (2) the arrangement and

composition of spaces and elements. Applying that standard, the Court **FINDS** that no reasonable juror could conclude that the Bainbridge and Rubin residence are substantially similar in "total concept and feel." There are simply too many striking differences between the exterior and interior design elements, as well as how they are arranged, to permit such a finding. Therefore, the Court **FINDS** that no reasonable juror could find that the Bainbridge and Rubins' residence are, intrinsically speaking, "substantially similar."

## V.   CONCLUSION

For the reasons set forth in Part III(A) of this Opinion and Order, the Court finds that Plaintiff's allegations: (1) raise a genuine issue of material fact concerning the Rubins' access to the Bainbridge design; but (2) fail to raise a genuine issue of material fact concerning access to the Bainbridge by Boathouse Creek and the Olsens. The Court, therefore, **GRANTS** the Renewed Motions for Summary Judgment filed by Boathouse Creek and the Olsens for lack of access. Olsen's Ren. Mot. for Summ. J., ECF No. 115; Boathouse's Ren. Mot. for Summ. J., ECF No. 119.

For the reasons set forth in Part III(B) of this Opinion and Order, the Court finds that Plaintiff's allegations fail to raise a genuine issue of material fact concerning: (1) whether the Bainbridge and Rubin residence are, extrinsically speaking, "substantially similar" with respect to their protectable elements; and (2) whether the Bainbridge and Rubin residence are, intrinsically speaking, "substantially similar." The Court, therefore, **GRANTS** the Rubins' Renewed Motion for Summary Judgment on that basis, ECF No. 121. The Court further **GRANTS** the Renewed Motions for Summary Judgment filed by Boathouse Creek and the Olsens on that basis, in addition to lack of access. Olsen's Ren. Mot. for Summ. J., ECF No. 115; Boathouse's Ren. Mot. for Summ. J., ECF No. 119.

The Court **ADVISES** the parties that it will not entertain any motions for attorney fees until all appeals have been exhausted and a final judgment entered. The Court, therefore, further **ADVISES** the parties that no motions for attorney fees should be filed until the aforementioned events have occurred.

The Clerk is **DIRECTED** to forward a copy of this Order to all Counsel of Record.

**IT IS SO ORDERED.**

Robert G. Doumar
Senior United States District Judge

UNITED STATES DISTRICT JUDGE

Norfolk, VA
September 30, 2013